861 P.2d 723 (1993)
Ron PRAY, Petitioner-Appellant,
v.
The JUDICIAL SELECTION COMMISSION OF the STATE of Hawaii, Respondent-Appellee.
No. 16959.
Supreme Court of Hawaii.
November 10, 1993.
*725 Jack Schweigert (Jeff L. Hossellman and Rory Soares Toomey with him on the briefs), Honolulu, for petitioner-appellant.
Bert T. Kobayashi, Jr. (Ernest H. Nomura and Dawn D.M. Ishihara with him on the briefs), Honolulu, for respondent-appellee.
Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Circuit Court Judge SPENCER, In Place of MOON, C.J., Recused.
LEVINSON, Justice.
In an original proceeding brought by the parties to this court upon an agreed statement of facts, pursuant to Hawaii Revised Statutes (HRS) § 602-5(3) (1985)[1] and Hawaii Rules of Appellate Procedure (HRAP) 14 (1987),[2] the petitioner Ron Pray (Pray) seeks public access to various lists of nominees previously submitted to the appointing authorities for the filling of judicial vacancies. Because the case presents questions of first impression and constitutional interpretation, we accepted jurisdiction by order dated April 13, 1993. The order designated Pray as the appellant and the respondent Judicial Selection Commission of the State of Hawaii (JSC) as the appellee and further directed the parties to file briefs addressing the following questions: (1) whether Rule 7 of the Rules of the Judicial Selection Commission (1992) (Rule 7)[3] is valid, inter *726 alia, in light of the requirements of article VI, section 4 of the Hawaii Constitution;[4] and (2) if valid, whether the confidentiality requirement of Rule 7 applies to the governor and chief justice of this court (i.e., the appointing authorities) after the JSC has submitted the lists of nominees for consideration.
For the reasons set forth in this opinion, we answer the first question in the affirmative and the second in the negative. Accordingly, we grant the petition in part and deny it in part.

I. BACKGROUND

Pray is a radio talk show host whose format is to discuss current topics of interest while on the air with those members of the public listening to his show. The JSC is a commission created by the Constitutional Convention of 1978. Pursuant to article VI, section 4 of the Hawaii Constitution, the JSC is authorized to "promulgate rules which shall have the force and effect of law" and is "attached" to the judicial branch of the state government for purposes of administration. Article VI, section 3 mandates that the JSC present to the relevant appointing authority a list of not less than six nominees for each judicial vacancy. Within thirty days thereafter, the appointing authority appoints an applicant from each list, subject to the prerogative of the state senate to consent to or reject gubernatorial appointments within an additional thirty day period. Id.[5]
The JSC initially promulgated its rules on April 23, 1979 and revised them in 1982, 1987, and 1992. Rule 7, however, has not been modified or amended since its promulgation. In light of Rule 7, it has been the consistent practice of the JSC and the appointing authorities to withhold public disclosure of the names of all judicial nominees except those actually appointed to judicial office by the appointing authorities.
Recently, the subject of the judicial selection process arose in the course of Pray's radio talk show. As a consequence, Pray demanded from the JSC the names of the nominees that had currently been submitted to the appointing authorities for consideration. The JSC, relying on Rule 7, refused to make the demanded disclosure. The JSC's refusal generated the original proceeding now before this court.

II. DISCUSSION

A. Rule 7 Is Not Invalid By Virtue Of The Provisions Of Article VI, Section 4.

Pray contends that the mandate of Rule 7 that "all [of the JSC's] records, proceedings, and business, including ... the names of nominees forwarded to the appointing authority, shall be confidential..." is incompatible with (and therefore unconstitutional in light of) article VI, section 4 of the Hawaii Constitution, which merely prescribes that the JSC's "deliberations" *727 shall be confidential. (Emphasis added.) From this premise, Pray concludes that, at least by inference, article VI, section 4 requires the eventual post-deliberation disclosure of the names of the JSC's nominees.
In addressing Pray's position, we must construe and interpret the parameters of a rule promulgated by a commission pursuant to a constitutional delegation of rule-making power. In this regard, the standard for determining the constitutionality of such a rule is analogous to the standard applicable to that employed in determining the constitutionality of a legislative enactment.
Inasmuch as "[t]his court [has] accepted original jurisdiction of this matter..., there is no standard of review as such." Blair v. Cayetano, 73 Haw. 536, 541, 836 P.2d 1066, 1069, recon. denied, 74 Haw. ___, 843 P.2d 144 (1992). However, "we have long held that: (1) legislative enactments are `presumptively constitutional;' (2) `a party challenging [a statutory scheme] has the burden of showing unconstitutionality beyond a reasonable doubt;' and (3) the constitutional defect must be `clear, manifest[,] and unmistakable.'" Sifagaloa v. Board of Trustees of the Employees' Retirement Sys., 74 Haw. 181, 191, 840 P.2d 367, 371 (1992) (quoting Blair, 73 Haw. at 542, 836 P.2d at 1069) (brackets in original and citations omitted); see also State v. Lee, 856 P.2d 1246, 1253 (Haw.1993) (citations omitted). As such, the constitutionality of Rule 7 is a question of law. C.f. Lee, 856 P.2d at 1253.
Thus, by analogy to the reasoning of Blair, Sifagaloa, and Lee, Pray "has the burden of demonstrating that [Rule 7] is a plain, clear, manifest, and unmistakable violation of the procedure set forth in [article VI, section 4 of the Hawaii Constitution.]" Blair, 73 Haw. at 542, 836 P.2d at 1070.

1. Article VI, section 4 neither expressly mandates that the JSC's lists of judicial nominees remain confidential nor that they be publicly disclosed.

We begin our analysis with the self-evident observation that the plain language of article VI, section 4 nowhere expressly mandates that the names of the JSC's nominees be made public; at the same time, Rule 7 requires the JSC to maintain the confidentiality, inter alia, of "the names of nominees forwarded to the appointing authority." The questions therefore arise whether the confidentiality provision of article VI, section 4 constrains the JSC from public disclosure and, if not, whether Rule 7 is in conflict with the constitutional provision. Put differently, the question is whether the term "deliberations," as employed in article VI, section 4, extends to the JSC's "records, proceedings, and business," as employed in Rule 7, so as to encompass the JSC's lists of judicial nominees and absolutely to preclude the JSC from publishing their names.
"`The general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written.'" Blair, 73 Haw. at 543, 836 P.2d at 1070 (quoting Spears v. Honda, 51 Haw. 1, 6, 449 P.2d 130, 134 (1968)). In this regard, the "settled rule" is that "`[i]n the construction of a constitutional provision ... the words ... are presumed to be used in their natural sense ... "unless the context furnishes some ground to control, qualify or enlarge [them]."'" Cobb v. State, 68 Haw. 564, 565, 722 P.2d 1032, 1033 (1986) (brackets in original and citations omitted).
Black's Law Dictionary 427 (6th ed. 1990) defines "deliberation," inter alia, to mean "[t]he act or process of deliberating. The act of weighing and examining the reasons for and against a contemplated act or course of conduct or a choice of acts or means." (Emphasis added.) Webster's Encyclopedic Unabridged Dictionary of the English Language 382 (1989) defines "deliberation," inter alia, to mean "careful consideration before decision." (Emphasis added.) Accordingly, in its "natural sense," the term "deliberations" encompasses only those acts, processes, or considerations undertaken prior to a final choice *728 or decision. For present purposes, it is the list of judicial nominees that represents the JSC's final choice or decision; the list itself is not a part of the JSC's "deliberations."
We therefore hold that article VI, section 4 of the Hawaii Constitution neither expressly mandates that lists containing the names of the JSC's judicial nominees remain confidential nor that they be publicly disclosed.

2. Pray has failed to overcome the presumption that Rule 7 is constitutional by proving beyond a reasonable doubt that Rule 7 clearly, manifestly, and unmistakably violates article VI, section 4 of the Hawaii Constitution.

As we have noted, article VI, section 4 is silent with respect to the confidentiality of the JSC's lists of judicial nominees. On the other hand, the plain language of Rule 7 enjoins the JSC not to disturb the confidentiality of "the names of nominees forwarded to the appointing authority." The question then becomes whether the admonition of Rule 7 is authorized by its enabling constitutional provisionarticle VI, section 4. By virtue of its silence, article VI, section 4 is ambiguous in this regard.
"When resolving ambiguity, we have repeatedly held `that the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it.'" Cobb, 68 Haw. at 565, 722 P.2d at 1033 (citations omitted). We have also acknowledged, in gleaning the intent of the framers and the people, that "an examination of the debates, proceedings and committee reports [of the Constitutional Convention] is useful." State v. Kahlbaun, 64 Haw. 197, 204, 638 P.2d 309, 316 (1981), recon. denied, 64 Haw. 688, 638 P.2d 309 (1982). Such evidence, however, "do[es] not have binding force on this court and its persuasive value depends upon the circumstances of each case." Id. (citations omitted). Where necessary to resolve constitutional ambiguity, this court may also "look to the object sought to be accomplished and the evils sought to be remedied by the amendment." Id. at 202, 638 P.2d at 315 (citations omitted).
Pray is correct that the proceedings of the 1978 Hawaii Constitutional Convention contain certain indications of an intent that the JSC's lists of judicial nominees be disclosed at some stage of the judicial selection process. In this regard, the provision that ultimately became article VI, section 4 was placed before the Convention in Committee Proposal No. 10 of the Convention's Standing Committee on the Judiciary. See Debates in Committee of the Whole on the Judiciary, reprinted in 2 Proceedings of the Constitutional Convention of Hawaii of 1978 (Proceedings) at 344-45 (1980). The Standing Committee on the Judiciary memorialized its support for Committee Proposal No. 10 in Standing Committee Report No. 52. Id. at 345; see also 1 Proceedings at 616-27.
Speaking in support of Committee Proposal No. 10 and Standing Committee Report No. 52, the chairman of the Standing Committee on the Judiciary, delegate Walter Ikeda, made the following statement during the August 30, 1978 debates of the Convention sitting as a Committee of the Whole:
One ... important aspect of the [JSC's] operation would be the matter of the confidentiality of the group's deliberations. Your Committee received much testimony from the local bar association and local attorneys as to the desirability of this feature. It was felt that confidentiality should be preserved at least as to the names of initial applicants and the deliberations thereafter.

2 Proceedings at 345 (emphasis added). Delegate Ikeda's remarks, at least by negative implication, could be construed to reflect a general expectation that "confidentiality" would cease at some point subsequent to the JSC's "deliberations."
The next day, in the course of debates in the Committee of the Whole regarding an amendment to Proposal No. 10, delegate Ikeda amplified upon his earlier remarks as follows:

*729 Madam Chairman, I would like to respond to a number of points that were made by some of the previous speakers. First of all, I think it's clear that the deliberations of the [JSC] are considered to be whatever vote the [JSC] takes in the matter of evaluating candidates, and I would interpret the language as to the deliberations of the [JSC] as indicating that these would be confidential.

Testimony of the bar association indicated  and it's something that the committee concurred in  that the six names, once they are selected, would be made public and the list then submitted to the governor or the chief justice. During that phase, ... there would be sufficient opportunity for public comment. In fact, it probably might be better at that point because then the choice is narrowed down to the candidates from whom the ultimate judge or justice will be chosen. There is also an opportunity  at least for circuit court judges and supreme court justices  for public input at the time of senate confirmation.
Id. at 398 (emphasis added). These remarks are a further reflection that at least a segment of the 1978 Constitutional Convention interpreted article VI, section 4 to contemplate ultimate public disclosure of the JSC's lists of judicial nominees.
On the other hand, the JSC is also correct that there is evidence in the proceedings of the 1978 Constitutional Convention that the framers intended to confer upon the JSC the authority to adopt such rules as the JSC deemed necessary to insure the confidentiality of its proceedings. In withdrawing the amendment to Proposal No. 10, delegate Ikeda stated on August 31, 1978:
[B]ecause there is in the committee proposal a provision that the [JSC] can make rules which have the force and effect of law[,] and believing that this rule-making power would cover the matter of confidentiality, I do not believe there is any need for this particular amendment.
For this reason, I would wish to withdraw the amendment, provided of course that the Committee of the Whole Report reflect the fact that the statement was made that we believe the [JSC] has in its rule-making power the right to adopt whatever rules it wishes on the subject of confidentiality of the receipt and review of applications.

Id. at 400 (emphasis added).
It is noteworthy that Committee of the Whole Report No. 10, which incorporated the sense of the Convention regarding the debates described above, reflected an even broader delegation of rule-making power to the JSC than that requested by delegate Ikeda. Comm. Whole Rep. No. 10, reprinted in 1 Proceedings at 1012-15. Specifically, the report contains the following language:
There were several amendments to the proposed language in this section [i.e., article VI, section 4] which were either withdrawn or failed to obtain the necessary votes for passage. One of the amendments proposed related to the confidentiality of the actions of the [JSC]. After considerable debate this amendment was withdrawn, with the understanding that the [JSC] would have power by way of its own rules to determine its boundaries and limits on the confidentiality of its actions.

Id. at 1015 (emphasis added).
Thus, in our view, the Proceedings of the 1978 Constitutional Convention of Hawaii are at best equivocal with regard to the scope of authority that the Convention intended to afford the JSC in delineating the confidentiality of its own records, proceedings, and business. At the very least, the Convention's proceedings fail to establish beyond a reasonable doubt that the framers intended to mandate that the JSC disclose the names of the judicial nominees forwarded to the appropriate appointing authority.
We next consider "the object sought to be accomplished and the evils sought to be remedied" by the process of judicial selection created by the 1978 Constitutional Convention, see Kahlbaun, 64 Haw. at 202, 638 P.2d at 315, which were articulated in Standing Committee Report No. 52, reprinted *730 in 1 Proceedings at 616-27, in the following manner:
Your Committee believes the following summary of major reasons supports a [JSC]:
1. It removes the selection of judges from the political consideration of one person and places it in the hands of a nonpartisan board of citizens;
2. The choice of nominees is made without consideration or influence of partisan politics;
3. It forms an independent panel of commissioners whose sole and exclusive function is to seek out, encourage and screen all candidates for judicial appointment;
4. It includes both lawyers and laypersons' views in the selection of judges; and
5. It permits consideration of many more qualified candidates who might otherwise be overlooked by one person.
Id. at 620. We believe that, unlike the Convention's debates, the report's statement of policy considerations underlying the creation of a JSC actually bolsters the prerogative of the JSC  as codified in Rule 7  to maintain the confidentiality of its lists of judicial nominees.
As a general matter, the JSC was clearly established, inter alia, for the purpose of creating a nonpartisan, apolitical judicial selection process. It is also clear that public disclosure of the names of judicial nominees prior to appointment inevitably increases the "partisan" or "political" pressures brought to bear on the process. A "partisan" is defined, inter alia, to mean "an adherent or supporter of a person, party or cause." Webster's at 1052 (emphasis added). In its adjectival sense, "partisan" means, inter alia, "partial to a specific party, person," id. (emphasis added), as in "partisan politics." Id. (emphasis in original). "Politics" is defined, inter alia, to mean "the science or art of political government," "the practice or profession of conducting political affairs," "political methods or maneuvers," and "the use of intrigue or strategy in obtaining any position of power or control." Id. at 1113 (emphasis added).
Judges are, of course, powerful officials of the judicial branch of government, which is coequal to the executive and legislative branches; judicial office is thus a position that is coveted by  and on behalf of many persons. Over a century ago, one of our country's preeminent political theorists recognized that "so long as government exists, the possession of its control, as the means of directing its action and dispensing its honors and emoluments, will be an object of desire." J.C. Calhoun, A Disquisition on Government 75 (1851). Every aspirant to judicial office must, of necessity, have his or her supporters, detractors, and competitors. While "lobbying" of the appointing authorities by public and private citizens alike, both for an against suspected judicial nominees, might already be occurring, public disclosure of the lists of actual nominees could only intensify such partisan political pressure.
Moreover, pursuant to article VI, section 3 of the Hawaii Constitution, once the lists of nominees to the circuit court, intermediate court of appeals, and supreme court are transmitted to the governor, "[t]he governor shall, with the consent of the senate, fill [the] vacanc[ies] ... by appointing ... person[s] from the list[s.]" Haw. Const. art. VI, § 3 (1978). If the senate rejects an appointment, "the governor shall make another appointment from the list." Id. Conceivably, if the senate were to have foreknowledge of the names of all judicial nominees on a list, it could simply "hold out" until the governor had no choice but to appoint its preferred candidate. Such a state of affairs would certainly further politicize the judicial selection process in contravention of the clearly articulated "major reasons" supporting the establishment of the JSC. See Stand.Comm.Rep. No. 52, reprinted in 1 Proceedings at 620.
On the other hand, Standing Committee Report No. 52 reflects on its face the framers' tripartite objectives of (1) "remov[ing] the selection of judges from the political consideration of one person [i.e., the appointing authority]," (2) allowing "[t]he *731 choice of nominees [to be] made [by the JSC] without consideration or influence of partisan politics," and (3) maximizing the consideration of "qualified candidates who might otherwise be overlooked." Id. In other words, the framers intended to divest the appointing authority of the exclusive power of judicial appointment and to interpose a nonpartisan and politically insulated "merit selection" process of prescreening the universe of potential applicants from which the appointing authority would be required to choose.
We conclude that the confidentiality provisions of Rule 7 both facilitate and are consistent with "the object sought to be accomplished" by the new constitutional scheme  nonpartisan merit selection of judges  and the "evils sought to be remedied" thereby  eliminating the exclusive concentration of the power of judicial appointment in the hands of a single individual. See Kahlbaun, 64 Haw. at 202, 638 P.2d at 315. Accordingly, we hold that Pray has failed to meet his burden of demonstrating beyond a reasonable doubt that Rule 7 is a plain, clear, manifest, and unmistakable violation of article VI, section 4 of the Hawaii Constitution.

B. The Appointing Authorities Are Not Bound By The Confidentiality Provision Of Rule 7

We now consider the second question that the parties were directed to address in this proceeding, namely, whether the confidentiality requirement of Rule 7 applies to the governor and chief justice of the supreme court after the JSC has submitted its lists of nominees for selection of judicial appointees.
In section II.B.1. of this opinion, we held as a general matter that article VI, section 4 of the Hawaii Constitution neither expressly mandates that the lists containing the names of the JSC's judicial nominees remain confidential nor that they be disclosed publicly. A fortiori, it follows that there is no express constitutional obligation imposed on the governor or the chief justice either to disclose the names or to keep them confidential.
Article VI, section 4, however, provides in relevant part that the rules promulgated by the JSC "shall have the force and effect of law." As we have noted, the plain language of Rule 7 constrains the JSC from publicly disclosing the names of judicial nominees forwarded to the appointing authorities. The question then becomes whether this constraint extends to the appointing authorities  the governor and the chief justice. For the reasons set forth below, we conclude that it does not.
In Kaapu v. Aloha Tower Dev. Corp., 74 Haw. 365, 846 P.2d 882 (1993), this court had recent occasion to reiterate the following well established rules of statutory construction:
"The interpretation of a statute is a question of law reviewable de novo. When construing a statute, our foremost obligation `is to ascertain and give effect to the intention of the legislature' which `is to be obtained primarily from the language contained in the statute itself.' We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. `When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute an ambiguity exists.' If the statutory language is ambiguous or doubt exists as to its meaning, `[c]ourts may take legislative history into consideration in construing a statute.'"
Id. at 387, 846 P.2d at 891 (quoting Franks v. City and County of Honolulu, 74 Haw. 328, 334-35, 843 P.2d 668, 671-72 (1993)) (citations omitted). By analogy, these rules of construction also apply to rules promulgated pursuant to a constitutional grant of authority, as in the present case.
Rule 7 does not expressly incorporate the governor and the chief justice within its ambit. However, there is uncertainty as to whether the rule's confidentiality provision applies only until such time as the lists of judicial nominees are transmitted to the relevant appointing authority or whether it mandates that the appointing authority *732 must preserve the confidentiality of the names subsequent to receipt of the lists.
We are aware of no recorded history generated by the JSC regarding the intended scope of its rules in general or the confidentiality provisions of Rule 7 in particular. However, we find the language of the 1978 Constitutional Convention's Committee of the Whole Report No. 10 instructive as to the extent to which the framers intended to empower the JSC to bind the appointing authorities by its rules. As noted above, the report provides in relevant part that the JSC "would have power by way of its own rules to determine its boundaries and limits on the confidentiality of its actions." Comm. Whole Rep. No. 10, reprinted in 1 Proceedings at 1015 (emphasis added). Thus, the plain language of Committee of the Whole Report No. 10 suggests that the framers intended only that the JSC have the power to "gag" itself and such other persons as might participate in its proceedings. Inasmuch as the JSC's proceedings with respect to any given judicial vacancy culminate in the transmission of a list of nominees to the appointing authority, the actions of the governor and chief justice affecting confidentiality and taken after the lists are received would logically fall outside the scope of the JSC's rules;[6] it therefore follows that such actions would be unconstrained by the confidentiality provisions of Rule 7.
We are of the further opinion that construing Rule 7 as not binding the governor and the chief justice to silence is consistent with the purposes, as set forth in the 1978 Convention's Standing Committee Report No. 52, supra, 1 Proceedings at 620, underlying the establishment of the JSC. Were the governor or the chief justice to choose to disclose publicly the names appearing on a list of judicial nominees subsequent to its transmittal, the prior deliberations of the JSC would in no way be subject to any additional "political consideration" or partisanship. See id. Neither should such a construction interfere with the JSC's "sole and exclusive function ... to seek out, encourage, and screen ... candidates for judicial appointment." Id. The anonymity of judicial applicants not included in the JSC's lists of nominees would remain protected. And, in our view, no stigma should attach to any judicial nominee not eventually appointed to office, inasmuch as all nominees are by definition deemed by the JSC to be qualified for appointment.
Nevertheless, we find no merit in Pray's contention that the "separation of powers" doctrine somehow requires the appointing authorities to disclose to the public the JSC's lists of judicial nominees. That doctrine is intended "`to preclude a commingling of ... essentially different powers of government in the same hands' and thereby prevent a situation where one department would be `controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments.'" Trustees of Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 168, 737 P.2d 446, 454, cert. denied, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987) (quoting O'Donoghue v. United States, 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933)).
Rule 7 neither subjects the state senate to a "coercive influence" from any other branch of government nor encroaches upon the duties or powers of the senate. Contrary to Pray's suggestion in his opening brief, nowhere does the Hawaii Constitution confer power or impose a duty upon the senate to select "the best candidate for judicial office." Opening brief at 14-15. Rather, the Hawaii Constitution confers that power and duty squarely upon the JSC and the appointing authorities. Haw. Const. art. VI, §§ 3 and 4.
Indeed, Pray's argument misconceives the constitutional role of the senate in the *733 judicial selection process. Article VI, section 3 expressly limits the senate's role to consenting to or rejecting judicial appointments made by the governor.[7] Obviously, that function does not come into play until after the governor has made his selection from the list presented by the JSC. Because the senate does not have the express constitutional authority to "compare and contrast" the respective nominees, failure to disclose their names in the course of the senate's deliberations cannot unlawfully encroach upon the senate's duties.
Conversely, the JSC's position that "[t]he confidentiality requirement of Rule 7 applies to the [governor and chief justice] after [the JSC] submits the list[s] of nominees... for consideration," answering brief at 27, itself violates the separation of powers doctrine. Such authority would literally transform the JSC into a fourth, coequal, and quasi-legislative branch of state government, empowered to control and subject to its "coercive influence" the independent functions and prerogatives of the heads of the executive and judicial branches. See Yamasaki, 69 Haw. at 168, 737 P.2d at 454. It is inconceivable to us that the 1978 Constitutional Convention, without comment, could have intended such a result.
We therefore hold that the confidentiality requirement of Rule 7 does not apply to the governor or the chief justice after the JSC has submitted its lists of judicial nominees for consideration. That being the case, we also hold that it is within the sole discretion of the appointing authorities whether to make public disclosure of the JSC's lists of judicial nominees.
Petition granted in part and denied in part.
SPENCER, Circuit Judge, concurring.
I concur with the majority's opinion. I simply disagree with the reasoning used by the majority to reach its conclusion that Rule 7 of the Rules of the Judicial Selection Commission (Rule 7) is valid.
The majority correctly finds that article VI, section 4 is ambiguous with respect to the authority of the Judicial Selection Commission (JSC) to implement a rule requiring confidentiality beyond its "deliberations". However, the majority then engages in a prolonged discussion to ascertain the intent of the Constitutional Convention and states in its analysis that "the Proceedings ... are at best equivocal with regard to the scope of authority that the Convention intended to afford the JSC in delineating the confidentiality of its own records, proceedings, and business...."
I disagree with the majority that the Convention's intent was equivocal. Debates and remarks by delegates regarding the scope of rule-making power to be delegated to the JSC on the subject of confidentiality culminated in Committee of the Whole Report No. 10 which contained the following language:
There were several amendments to the proposed language in this section [i.e., article VI, section 4] which were either withdrawn or failed to obtain the necessary votes for passage. One of the amendments proposed related to the confidentiality of the actions of the [JSC]. After considerable debate this amendment was withdrawn, with the understanding that the [JSC] would have power by way of its own rules to determine its boundaries and limits on the confidentiality of its actions. (Emphasis added.)
Debates in Committee of the Whole on the Judiciary reprinted in 2 Proceedings of the Constitutional Convention of Hawaii of 1978 at 1015 (1980).
*734 In my mind, there is nothing equivocal about the above language. It clearly and without ambiguity expresses the Convention's intent that the JSC have the power to determine the boundaries of confidentiality of its actions. No further analysis was required by the majority to reach the conclusion that Rule 7 was within the JSC's authority under article VI, section 4, and is valid.
NOTES
[1] HRS § 602-5 (1985 and Supp.1992) provides in relevant part:

Jurisdiction and powers. The supreme court shall have jurisdiction and powers as follows:
....
(3) To entertain, in its discretion, any case submitted without suit when there is a question in difference which might be the subject of a civil action or proceeding in the supreme court, circuit court, or tax appeal court, and the parties agree upon a case containing the facts upon which the controversy depends....
[2] HRAP 14 (1987), entitled "Agreed facts; submission on," provides in relevant part:

(a) Submission. Parties to a dispute which might be the subject of a civil action or proceeding addressed to the jurisdiction of the Hawaii appellate court, circuit court, district court, family court, land court, or tax appeal court may, without action, agree upon containing the facts upon which the controversy depends, a statement of the question or questions in difference, the contentions of the parties, and the form of judgment to be rendered.
....
(c) Disposition. ... If the appellate court entertains the case, the judgment rendered thereon shall be entered and may be enforced as in other cases, subject to the right of a party to move for reconsideration.
[3] Rule 7, entitled "Confidentiality," provides in relevant part:

Under the Constitution of the State of Hawaii, the [JSC's] proceedings must be confidential. Therefore, all [of the JSC's] records, proceedings, and business, including the names of all proposed nominees and the names of nominees forwarded to the appointing authority, shall be confidential and may not be discussed outside commission meetings, except among commission members, ... or pursuant to Rule 14.
JSC Rule 7 (1992) (emphasis added).
Rule 14, entitled "Transmittal to the appointing authority," provides:
A. The names of the nominees, listed in alphabetical order, shall be hand-delivered to the appointing authority.
B. No other information shall be forwarded to the appointing authority, except that the [JSC] may submit to the appointing authority a factual summary of the nominee's background based on material provided by the nominees, and the [JSC] may consult with the appointing authority on request.
JSC Rule 14 (1992).
[4] Article VI, section 4 of the Hawaii Constitution provides in relevant part that "[t]he [JSC] shall promulgate rules which shall have the force and effect of law. The deliberations of the [JSC] shall be confidential." Haw. Const. art. VI, § 4 (1978).

Pursuant to article VI, section 3 of the Hawaii Constitution, the governor of the state is the appointing authority with respect to the chief justice and associate justices of the supreme court, as well as judges of the intermediate court of appeals and the circuit courts. Haw. Const. art. VI, § 3 (1978). The same section designates the chief justice as the appointing authority with respect to judges of the district courts. Id.
[5] If the senate fails to reject any gubernatorial appointment within the thirty day period, it is deemed to have given its consent. Haw. Const. art VI, § 3 (1978).
[6] We acknowledge that Rule 14(B) of the JSC authorizes the JSC to "consult with the appointing authority on request." JSC Rule 14(B) (1992). The title of Rule 14, however, establishes that its scope is limited to matters incidental to the "[t]ransmittal [of lists] to the appointing authority." In any event, the confidentiality provisions of Rule 7 are expressly subordinated to the prerogatives of the JSC and the appointing authorities pursuant to Rule 14. See supra note 3.
[7] Article VI, section 3 of the Hawaii Constitution provides in relevant part:

The governor shall, with the consent of the senate, fill a vacancy in the office of the chief justice, supreme court, intermediate appellate court and circuit courts, by appointing a person from a list of not less than six nominees for the vacancy, presented to the governor by the [JSC].
... If the senate shall reject any appointment, the governor shall make another appointment from the list....
Haw. Const. art VI, § 3 (1978) (emphasis added).