935 P.2d 89

HAWAI'I STATE AFL–CIO; Gary W. Rodrigues; Russell Okata; Keith Ahue; Jackie Fergusen–Miyamoto; Donald Abdul; Nilda Chock; Clayton Dela Cruz; Guy Fujimura; Carmen Gomez; Leonard Hoshijo; Jonathan Kane; Mark Matsumoto; Stuart McKinley; Richard Rutt; Lawrence Sakamoto; Howard Tasaka; Peter Trask; Adaline Uhrle; George Yasumoto; Michael Amii; Genevieve Baker; Dennis Chang; Patricia A. Chow; Garen R. Deweese; Leslie Anne Deweese; Jan Doi; Robert Doi; Melvin Fong; Kay Fujimoto; Kimberly Haines; William Hoshijo; Marsha R. Joyner; Calvin Koseki; Leimalama Lee Loi; Alyce Ma; Robert Matsunaka; Laverne Moore; Cherie Nagao; Craig Nahm; Ayako Nakanishi; Douglas Pang; Larry Sakoda; Ethel Shintaku; Andrei Soto; Carl Sunada; George Thomas; Leilani Thomas; Linda N. Thomas; Jeanine Tsuchiya; Maureen Wakuzawa; Harry Wood; Lana Young, Plaintiffs,

v.

Dwayne D. YOSHINA, as Chief Elections Officer; Mazie K. Hirono, as Lieutenant Governor of the State of Hawai'i; Margery S. Bronster, as Attorney General of the State of Hawai'i; Benjamin J. Cayetano, Governor of the State of Hawai'i; and the State of Hawai'i, Defendants.

No. 20267.

Supreme Court of Hawai'i.

March 24, 1997.

dant Dwayne D. Yoshina, to certify that the measure was rejected.

Herbert R. Takahashi and Rebecca L. Covert of Takahashi, Masui & Vasconsellos, and Marsha S. Berzon and Lowell Finley of Altshuler, Berzon, Nussbaum, Berzon & Rubin, pro hac vice, on the briefs, Honolulu, for plaintiffs.

Russell A. Suzuki, E. Diane Erickson, John P. Dellera and Jon S. Itomura, Deputy Attorneys General, on the briefs, Honolulu, for defendants.

Mark J. Bennett (of counsel, McCorriston Miho Miller Mukai), on the briefs, Honolulu, for Amicus Curiae Citizens for a Constitutional Convention and Let the People Decide.

Shelton G. W. Jim On of Jim On & Beerman, and Richard R. Clifton of Cades Schutte Fleming & Wright, on the briefs, Honolulu, for Amicus Curiae Republican Party of Hawaii.

David H. White, on the briefs, Honolulu, for Amicus Curiae Pacific Legal Foundation.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In this original proceeding brought pursuant to Hawai'i Revised Statutes (HRS) § 11–172 (1993),[1] Plaintiffs seek a judgment that a November 5, 1996 general election ballot measure on whether to convene a constitutional convention did not receive the required affirmative mandate as required by article XVII, section 2 of the Hawai'i Constitution. Because the majority of the ballots cast on the question did not reflect affirmative votes, we order the Chief Election Officer, Defen-

## I. BACKGROUND

Pursuant to the mandate of article XVII, section 2 of the Hawai'i Constitution, the Lieutenant Governor, Defendant Mazie K. Hirono, certified the question "[s]hall there be a convention to propose a revision of or amendments to the Constitution" [hereinafter, the convention question] for vote in the November 5, 1996 general election. The convention question was printed on Ballot "C," along with three proposed constitutional amendments. The parties agree that 369,357 ballots were deposited on the convention question, with 163,869 ballots marked "yes," 160,153 ballots marked "no," 45,245 ballots left blank, and 90 ballots marked both "yes" and "no" [hereinafter, over votes]. Calling a constitutional convention requires that "a majority of the ballots cast upon [the convention] question be in the affirmative[.]" Haw. Const. art. XVII, § 2.

On November 6, 1996, Defendant Yoshina requested from Defendant Margery S. Bronster, the Attorney General of the State of Hawai'i, an opinion regarding the calculation of "a majority" on the convention question. In an opinion rendered November 19, 1996, the Attorney General concluded that " 'majority of the ballots cast upon such a question' means a majority of the 'yes' and 'no' ballots, but excludes blank ballots and overvoted ballots." Op. Att'y Gen. No. 96–5 at 13.

Plaintiffs filed their complaint on November 25, 1996, alleging that "Defendant Yoshina's failure to count all ballots cast on the convention question of November 5, 1996 is improper and unlawful and will produce an erroneous and invalid 'certification' of elec-

---

1. HRS § 11–172 provides:

   With respect to any election, any candidate, or qualified political party directly interested, or any thirty voters of any election district, may file a complaint in the supreme court. The complaint shall set forth any cause or causes, such as but not limited to, provable fraud, overages, or underages, that could cause a difference in the election results. The complaint shall also set forth any reasons for re-

   versing, correcting, or changing the decisions of the precinct officials or the officials at a counting center in an election using the electronic voting system. A copy of the complaint shall be delivered to the chief election officer or the clerk in the case of county elections. The parties have stipulated that "the named Plaintiffs in the above referenced action, in their individual capacities, have standing to bring this cause of action."

tion results within the meaning of HRS § 11–172 and § 11–174.5[,]" and that,

> [u]nless otherwise declared erroneous and invalid by this Court in accordance with HRS § 11–172 and § 11–174.5, Defendant Yoshina's aforementioned conduct will cause Defendants Hirono, Bronster, Cayetano, and the State of Hawaii to convene a constitutional convention soon hereafter, without the required "affirmative" mandate under Article XVII, Section 2 of the State Constitution, at great and unnecessary public expense and cost.

By Order dated December 17, 1996, the court ordered briefing on the dispositive issue: "whether the term 'ballots cast' contained in Article XVII, Section 2 includes all 'yes' and 'no' votes, all 'over' votes, and all blank ballots or, in the alternative, whether the term 'ballots cast' includes only 'yes' and 'no' votes."

## II. *STANDARD OF REVIEW*

Because the court has original jurisdiction in this matter, "there is no standard of review as such." *Blair v. Cayetano*, 73 Haw. 536, 541, 836 P.2d 1066, 1069, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

■ Resolution of the disputed issue involves interpretation of article XVII, section 2 of the Hawai'i Constitution. Because constitutions derive their power and authority from the people who draft and adopt them, "[w]e have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996) (citation omitted). "This intent is to be found in the instrument itself." *State v. Kahlbaun*, 64 Haw. 197, 201, 638 P.2d 309, 314 (1981).

■ As we recently reiterated in *State of Hawai'i, ex rel. Bronster v. Yoshina*, 84

Hawai'i 179, 932 P.2d 316 (1997), "[t]he general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written." *Id.*, 932 P.2d at 323 (quoting *Blair*, 73 Haw. at 543, 836 P.2d at 1070 (citation omitted)). "In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them." *Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 342, 861 P.2d 723, 727 (1993) (citation, internal quotation marks, brackets and ellipses omitted).

■ Moreover, "a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it[.]" *Carter v. Gear*, 16 Haw. 242, 244 (1904), *affirmed*, 197 U.S. 348, 25 S.Ct. 491, 49 L.Ed. 787 (1905).

## III. *DISCUSSION*

A. *As Written, the Plain Language of Article XVII, Section 2, Used in its Natural Sense, Includes Blank Ballots and Over Votes.*

■ Section 1 of article XVII prescribes two methods for initiating revisions or amendments to the Hawai'i Constitution: "by constitutional convention or by the legislature." Section 2 describes the procedures for calling a constitutional convention, electing delegates, and ratifying revisions and amendments proposed by the convention. The relevant language of article XVII, section 2, which has remained largely unchanged since it was drafted by the delegates to the Constitutional Convention of 1950 and ratified by plebiscite in both 1950 and 1959, *see 1 Proceedings of the Constitutional Convention of Hawai'i 1950*, at xi (1960) [hereinafter, 1 *Proceedings 1950* ],[2] provides as follows:

---

**2.** Article XVII, section 2 was renumbered in 1978. 1 *Proceedings of the Constitutional Convention of Hawai'i 1978*, 577–78, 610, 1177–79 (1980) [hereinafter, 1 *Proceedings 1978* ]. As ratified by plebiscite on November 7, 1950, the relevant language was at article XV, section 2. Other changes were: (1) the reduction of the percentage of registered voters needed to ratify

**CONSTITUTIONAL CONVENTION**

**Section 2.** The legislature may submit to the electorate at any general or special election the question, "Shall there be a convention to propose a revision of or amendments to the Constitution?" If any nine-year period shall elapse during which the question shall not have been submitted, the lieutenant governor shall certify the question, to be voted on at the first general election following the expiration of such period.

**ELECTION OF DELEGATES**

If a *majority of the ballots cast upon such a question* be in the affirmative, delegates to the convention shall be chosen at the next regular election unless the legislature shall provide for the election of delegates at a special election.

. . . .

**RATIFICATION; APPROPRIATIONS**

. . . .

The revision or amendments shall be effective only if approved at a general election by a majority of all the votes tallied upon the question, this majority constituting at least fifty per cent of the total vote cast at the election, or at a special election by a majority of all the votes tallied upon the question, this majority constituting at least thirty per cent of the total number of registered voters.

The provisions of this section shall be self-executing, but the legislature shall make the necessary appropriations and may enact legislation to facilitate their operation.

Haw. Const. art. XVII, § 2 (emphasis added). Because the relevant language, "majority of the ballots cast upon such a question," is

clear and unambiguous, we construe the words as written, presuming them to be used in their natural sense.

1. **"ballots cast"**

Although the phrase "ballots cast" is undefined in article XVII, section 2, each word has well-recognized and longstanding meaning. A "ballot" is "a printed or written ticket or single sheet or slip of paper, used generally in secret voting. A printed ballot, as officially prepared for public elections, contains the names of candidates, or referenda propositions." *Webster's New International Dictionary* 209 (2d ed.1959). "Cast" means, *inter alia*, "[t]o deposit (a ballot) formally or officially[.]" *Id.* at 417. Thus, the phrase "ballots cast," using the component words in their natural sense, means the aggregate printed or written tickets, sheets or slips of paper deposited in the appropriate receptacle.

The fact that the framers of our constitution and those who voted to adopt it were aware of the meanings of "ballots" and "cast" is apparent from contemporaneous election statutes and judicial decisions. *See, e.g., Bingo Coalition v. Board of State Canvassers,* 215 Mich.App. 405, 546 N.W.2d 637, 640 (drafters of a constitutional provision "are presumed to have known the existing law and to have drafted the constitutional provisions in light of that knowledge."), *appeal denied,* 550 N.W.2d 535 (Mich.1996). Well before the 1950 Constitutional Convention, Revised Laws of Hawai'i (RLH) § 204 (1945) clearly defined a "ballot" as "a written or printed, or partly written and partly printed paper containing the names of persons to be voted for and the office to be filled[.]" Other territorial statutes required the secretary of the territory to provide "suitable ballot boxes for each polling place," RLH § 203 (1945),

proposed amendments or revisions to the constitution in special elections from thirty-five percent to thirty percent, *see* Comm. of the Whole Rep. No. 13, in 1 *Proceedings of the Constitutional Convention of Hawai'i 1968,* 348–49, 483 (1973); (2) the stylistic modification to paragraph 2 of section 2, which added "a" between "such" and "question," in the phrase "if a majority of the ballots cast upon such question be in the affirmative," *see* Stand. Comm. Rep. No. 48, in 1 *Pro-*

*ceedings 1978, supra,* at 610; (3) the reduction of the minimum interval for presenting the convention question to the electorate from ten years to nine years; and (4) the increase in the percentage of "the total vote cast" at a general election required to ratify a revision or amendment to the constitution from thirty-five percent to fifty percent. *See* 1980 Haw. Sess. L., Proposed Constitutional Amendments at 965–66.

and described the process by which ballots were to be cast, to wit:

> [the voter shall] deliver the ballot so folded, to the inspector of election in charge of the ballot boxes, who shall not open or unfold the same, but shall examine the ends of the same sufficiently to be satisfied that there is but one ballot enfolded, whereupon the ballot shall be immediately dropped into the proper box by such inspector.

RLH § 221 (1945). *See also Lane v. Fern,* 20 Haw. 290, 297 (1910) (explaining that a ballot "is cast when the voter has exhausted all reasonable efforts to have it placed in the box.").

Another statute prescribed how votes for candidates were to be counted and *tallied,* which only occurred after "[t]he whole number of ballots [in the ballot box] shall first be counted to see if their number corresponds with the number of ballots *cast* as recorded by the inspectors." RLH § 235 (1945) (emphases added). RLH § 237 (1945) enumerated the defects that would invalidate a ballot and cause it to be rejected by the chairman of inspectors, "[b]ut no ballot shall be rejected for containing a less number of names voted for than the law authorizes." *Id.*

Because a ballot is "cast" without regard to whether the ballot indicates the choice of the voter, the phrase "ballots cast," in its natural sense, refers to the total number of ballots deposited in the ballot box, including blank ballots and over votes.

### 2. "upon such a question"

The context in which the phrase "ballots cast" appears in article XVII, section 2, followed by "upon such a question," does not, moreover, "furnish[ ] some ground to control, qualify, or enlarge" the plain meaning of the words used, *Pray,* 75 Haw. at 342, 861 P.2d at 727, as Defendants and their amici appear to argue.

The convention question may be submitted to the voters at "any general or special election[.]" Haw. Const. art. XVII, § 2. Where the convention question is submitted as part of a multiple-candidate, multiple-issue election, the phrase "upon such a question" is necessary to identify which of the "ballots cast" are relevant for the purpose of calculating a majority on the convention question. In the November 5, 1996 general election, each voter was given at least four ballots, marked "A," "B," "C," and "D." [3] The statewide summary report of the general election results indicates that, out of a "total turnout" of 370,230, there were 370,230 "A Ballots Cast," 369,427 "B Ballots Cast," 369,357 "C Ballots Cast," and 282,665 "D Ballots Cast." Obviously, the "ballots cast upon [the convention] question" are the ballots on which the convention question was printed, in this case, the "C Ballots Cast," rather than the 1,391,679 total ballots cast or the 370,230 voters who cast ballots.

This is implicitly acknowledged by the Defendants, who agree that "369,357" is the appropriate number of ballots cast "on [the convention] question" for purposes of determining whether the convention question received the requisite majority. *See, e.g.,* Op. Att'y Gen. No. 96–5 at 1 ("We understand that 369,357 ballots bearing the pre-printed question were deposited by the voters during the 1996 general election."); Defendants' Answering Brief at 3 ("Of the 369,357 total ballots deposited by the voters, . . ."). *See also* Amicus Curiae Brief of Pacific Legal Foundation at 1 ("Of the 369,357 ballots returned on the convention question, . . .").[4]

The modifying phrase "upon such a question" also serves an important stylistic function in article XVII, section 2, by clarifying the relationship between the first and second

---

**3.** Voters eligible to elect Trustees of the Office of Hawaiian Affairs were given more than four ballots.

**4.** Defendants' other amici, Citizens for a Constitutional Convention et al. and the Republican Party of the State of Hawai'i, miss the point. The former interprets "ballots cast upon such a question" as "those voting in the general election," and argues that "Plaintiffs wish to use the number of persons entering the voting booth and voting for president or some other office in determining whether the constitutional convention proposal passed." The Republican Party ignores not only the language of article XVII, section 2, but also its very existence, arguing only that "the exclusion of blank, spoiled or invalid ballots is both judicially and statutorily mandated."

paragraphs of the section. The first paragraph of section 2 provides for when and how the convention question is to be submitted to the electorate. The phrase "upon such a question" appears in the second paragraph of section 2 under the heading "Election of Delegates," a process that occurs only after it has been determined that the constitutional convention has been approved. The phrase "upon such a question" makes clear that the "ballots cast" referred to in the second paragraph are the ballots cast on the convention question referred to in the first paragraph, rather than ballots cast for the election of delegates referred to in the second paragraph.

Thus, the addition of the phrase "upon such a question" in the second paragraph of section 2 identifies the relevant subset of "ballots cast," i.e., those ballots upon which the specific question was printed, and clarifies the relationship between the first two paragraphs of the section. It does not, as the Defendants and their amici appear to assume, change the plain meaning of "ballots cast."

In support of their argument that "ballots cast" excludes blank ballots and over votes, the Defendants and their amici rely almost entirely on *Republican Party of Hawaii v. Waihee*, 68 Haw. 258, 709 P.2d 980 (1985) (*per curiam*). Their reliance is misplaced. In *Waihee*, the county charter provision at issue provided that "[i]f a majority of the registered electors who *vote on the question* at a recall election shall vote 'Yes,' the elected officer shall be deemed recalled[.]" *Id.* at 259, 709 P.2d at 980 (emphasis added). The court acknowledged the general view that "blank, illegal, and unintelligible ballots should be rejected in computing the number of votes[,]" *id.* at 259–60, 709 P.2d at 981 (citations omitted), but stressed that "[w]hether that general view has any application in a particular case *depends on the particular wording of the charter, statute or constitutional provision in question.*" *Id.* at 260, 709 P.2d at 981 (emphasis added). *See also State ex rel. Blair v. Brooks*, 17 Wyo. 344, 99 P. 874, 875 (1909) (explaining that various state courts have reached different conclusions on the nature of the popular ma-

jority required to ratify constitutional amendments because "[e]ach decision ... is based upon the wording of the constitutional provision in the jurisdiction in which the question arose"); *City of Wellsville v. Connor*, 91 Ohio St. 28, 109 N.E. 526, 527 (1914) (stating that, in determining the number of votes needed to pass a particular provision, "courts have adopted the interpretation required by the language of the respective statutes involved").

The *Waihee* court, citing cases interpreting the phrases "votes cast" or "votes upon the question," opined that

> [t]he ballot gives the voter a choice of voting either "yes" or "no" on the question of whether a particular councilman is to be recalled. A blank vote, being neither a "yes" nor a "no" vote on the question of recall, cannot be considered in determining whether or not there was a majority of "yes" votes on that question.

68 Haw. at 260, 709 P.2d at 981 (emphasis omitted). *Waihee* and the other cases cited by the Defendants and their amici, however, construe language that is quite different than "the particular wording of the ... constitutional provision in question." *Id.*

> While the terms "ballot" and "vote" are sometimes confused, and while they may sometimes be used synonymously, the ballot is, in fact, under our form of voting, the instrument by which the voter expresses his [or her] choice between two candidates or two propositions; and his [or her] vote is his [or her] choice or election between the two, as expressed by his [or her] ballot[.]

*Davis v. Brown*, 46 W.Va. 716, 34 S.E. 839, 841–42 (1899). *See also State ex rel. Cashmore v. Anderson*, 160 Mont. 175, 500 P.2d 921, 929 (1972) ("the act of *voting* consists of marking a valid *ballot* that is deposited in the ballot box and counted in the election" (emphasis added)), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1372, 35 L.Ed.2d 593 (1973). Cases construing the meaning of "votes upon the question," therefore, lend no support to the Defendants' argument that "ballots cast" means only ballots marked with "yes" or "no" votes and excludes blank ballots and

over votes.[5] Defendants, in fact, cite *no* authority for the proposition that "ballots cast" excludes blank ballots. As the plaintiffs point out, where the phrase "ballots cast" has been construed, the interpretation appears to include blank and spoiled ballots. *See, e.g., People ex rel. Hewitt v. Cincinnati, L. & C. Ry. Co.,* 256 Ill. 280, 100 N.E. 208 (1912) (holding that levy of road tax was illegal where statute required "a majority of all the ballots cast at said election" to approve a road tax, and, although majority of those voting "yes" or "no" on the tax voted in favor, it failed to receive a majority of ballots cast at the election).

B. *The Relevant Committee Reports and the Other Provisions of Article XVII, Section 2 Demonstrate that the Phrase "Ballots Cast" Was Intended to Include Blank or Spoiled Ballots.*

When article XVII, section 2 is construed as a whole, it appears that the framers were specific and intentional in their use of the relevant terms. It is also clear from the relevant reports that, notwithstanding the general rule recognized by the *Waihee* court in 1985, the framers of article XVII, section 2, in 1950, intended "the total vote cast," like "ballots cast," to include blank ballots.

Ratification of proposed revisions or amendments requires:

approv[al] at a general election by a majority of *all the votes tallied* upon the question, this majority constituting at least fifty per cent of *the total vote cast* at the election, or at a special election by a majority of all the votes tallied upon the question, this majority constituting at least thirty per cent of the total number of registered voters.

Haw. Const. art. XVII, § 2 (emphases added). The standing committee report explained that the distinction between "votes tallied" and "vote cast" was significant and intended:

Upon questions other than reapportionment of the Senate, if the vote is taken at a general election, the ratification must be by a majority of the votes tallied upon the question, but such majority must also constitute at least 35 per cent of the total vote cast at such election. *The reason for using the term "votes tallied" is to exclude blank ballots and spoiled ballots on the ratification question only, thus requiring the majority of the votes actually tallied for or against ratification.* This measure is used because of evidence submitted to your Committee showing that, in a great many general elections, the total number of votes *cast* for or against a constitutional amendment or revision is very much less than the total number of votes *cast* for candidates. This seems to be accounted for by the fact that many voters find little difficulty in voting to elect individuals, but are confused or unwilling to indulge in the mental labor of deciding difficult questions of constitutional policy, and therefore often either *cast blank ballots* or, in the case of voting machines, refuse to vote on the proposition. The result often is that, although an overwhelming majority of the persons actually voting for or against the proposition may approve it, the total of all such persons so voting is less than one half of the total number voting for candidates.

Stan. Comm. Rep. No. 48, in 1 *Proceedings 1950, supra,* at 187 (emphases added).

During Committee of the Whole deliberations, the distinction between "tallied" and "cast" triggered an extended debate on the floor of the convention. The relevant comments of key members of the standing committee, although not dispositive, reflect the framers' understanding of the language used.

---

**5.** For the same reason, HRS § 11–151(3) (1993) is not controlling. HRS § 11–151 provides in pertinent part:

Each contest or question on a ballot shall be counted independently as follows:

. . .

(3) *If a contest or question requires a majority of the votes* for passage, any blank, spoiled, or invalid ballot shall not be tallied for passage or as votes cast *except that such ballots shall be counted as votes cast in ratification of a constitutional amendment.*

(Emphases added.) The convention question requires, for passage, "a majority of the ballots cast upon such a question," not a "majority of the votes." Thus, by its own terms, HRS § 11–151(3) is inapplicable.

HEEN: I rise to a point of information. By using the word "tallied" in one place and the word "cast" in another place, is it supposed that there is a difference in the meaning of the two words?

. . .

WIRTZ: Yes, it was the consensus of the committee that "tallied" were the actual votes "yes" or "no" on a proposition and that were actually tallied in the booth, whereas votes cast included—*the total number of votes cast included spoiled ballots and so on.*

. . .

As I understand it, maybe the chairman would like to answer this, but my understanding was that *we were going under the impression that spoiled ballots and blank ballots were counted as ballots cast in the election.*

. . .

[CHAIRMAN] FUKUSHIMA: I'd like to add a little to what Judge Wirtz has said. I think when you go to the polls, and you give your name and your name is scratched out, that is counted as a vote cast. *Now, whether you submit a blank ballot or whether your ballot is checked off as being an illegal ballot, nevertheless, it's still a vote cast.* I think that's correct. Is it or not?

SHIMAMURA: May I ask if that distinction is clearly brought out in the committee report so that there won't be any difficulty in interpretation and construction. I've been trying to look for that page but I can't locate it.

. . .

FUKUSHIMA: It's page 5 and 6. "The reason for using the term 'votes tallied,' is to exclude blank ballots and spoiled ballots on the ratification question only, thus requiring the majority of the votes actually tallied for or against ratification."

2 *Proceedings 1950, supra,* at 765 (emphases added).

Legislation enacted in 1953, co-authored by Representative Fukushima, the Chairman of the standing committee at the 1950 constitutional convention, confirms the understanding of the delegates:

Sec. 234.01. Votes cast, definition of. The term 'Votes Cast' for any election purposes, shall mean:

(1) Any ballot which is presented by any voter to the inspector of election in charge of the ballot box, to be deposited in the ballot box, regardless of whether it be a blank ballot or a ballot later rejected for any reason.

(2) Any ballot which is returned, as having been voted under the provisions of sections 227 to 233, inclusive, as amended, and regardless further of whether it be a blank ballot or a ballot later rejected for any reason.

1953 Haw. Sess. L. Act 181, § 1, at 35. Although Act 181 was enacted after the 1950 constitutional convention, by the time the final version of the Hawai'i Constitution was adopted and implemented in its entirety by plebiscite on June 27, 1959, *see 1 Proceedings 1950, supra,* at xi, it was established by legislative requirement that blank ballots were to be included as "votes cast" or "ballots cast" for "any election purposes." Act 181 remained in effect until 1971, when revisions to the election statutes became effective. 1970 Haw. Sess. L. Act 26, § 17 et. seq.

■ Clearly, the standing committee intended a distinction between the words "tallied" and "cast"; therefore, the use of "cast" in paragraph 2 of article XVII, section 2 is significant. When the same word is used more than once in a constitutional provision, it would be illogical and inconsistent to presume that the drafters intended different meanings. *Cobb v. State,* 68 Haw. 564, 566, 722 P.2d 1032, 1034 (1986). Correlatively, "where [the framers] include[ ] particular language in one section of a [constitutional provision], but omit[ ] it in another . . . it is generally presumed that [the framers] act[ed] intentionally and purposefully in the disparate inclusion or exclusion." *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993) (referring to Congress and statutes) (ellipses in original) (citation and internal quotation marks omitted).

When the framers intended that blank ballots be excluded from the calculation of a

majority, they used particular language—"votes tallied upon the question." The fact that that language was not only omitted, but rather substituted with the phrase "ballots cast upon such a question" in the second paragraph of article XVII, section 2 is presumed to be intentional and purposeful, indicating an intent to include blank and spoiled ballots. Even the Defendants recognize that, "[b]ecause the drafters of our constitution did not use the same words for the two procedures, the same interpretation cannot be given to the two provisions."

Defendants and their amici also acknowledge that the drafters of article XVII, section 2 were mindful

> that the amending procedure should not be made too easy, since undue ease of amendment impairs the respect of the public for its basic law, tends to unduly lengthen and burden the constitution with legislative matters and minutiae, and encourages attempts by visionaries and selfish pressure groups to advance impracticable schemes and proposals.

Stand. Comm. Rep. No. 48, in 1 *Proceedings 1950, supra,* at 186. They argue, however, that, although ratification of revisions or amendments requires an extraordinary majority, calling a constitutional convention was intended to be easier than amending or revising the constitution and, that, therefore, only a simple majority of the "yes" and "no" votes is required on the convention question. Defendants contend that the inclusion of blank ballots within the definition of "ballots cast" impermissibly renders the phrase "a majority of the ballots cast upon such a question" indistinguishable from "a majority of the vote cast at the election."

This argument is without merit for several reasons. First, the intent of the framers "is to be found in the instrument itself." *Kahlbaun,* 64 Haw. at 201, 638 P.2d at 314. The plain language of article XVII, section 2, used in its natural sense, indicates the framers' intent to include blank ballots in the calculation of whether the required majority has been attained.

Second, there is nothing in either the language or structure of the provision, on the one hand, or its history, on the other, to suggest that only a simple majority of "yes" and "no" votes was intended to be sufficient to call a constitutional convention. The procedure for ratification of revisions or amendments is the same whether the amendments are initiated by the legislature or by a constitutional convention, and clearly requires an extraordinary majority. When initiated by the legislature, proposals for amendments also require extraordinary majorities, *i.e.,* "a two-thirds vote of each house on final reading at any session ... or ... a majority vote of each house on final reading at each of two successive sessions." Haw. Const. art. XVII, § 3. There is nothing inconsistent about requiring more than a simple majority to set in motion the other means of initiating changes to our "basic law" by constitutional convention.

Finally, article XVII, section 2 describes three *distinct* means of calculating the requisite number of votes to attain a majority on a constitutional proposition in a general election: (1) to convene a constitutional convention requires that "a majority of the ballots cast upon [the convention] question" be in the affirmative; (2) to ratify a proposed constitutional revision or amendment at a general election requires approval "by a majority of all the votes tallied upon the question"; and (3) approval by "at least fifty per cent of the total vote cast at the election[.]" That construing "ballots cast upon [the convention] question" to include blank ballots does not render the phrase indistinguishable from a majority of "the total vote cast at the election," and that, even when the phrase is so construed, it is still more difficult to amend the constitution than to call a constitutional convention, is illustrated by a the following example:

Assume that, in a general election, voters were given two ballots. Ballot "A" enumerated the candidates for public office, and ballot "B" posed a constitutional question. The statewide summary report of this hypothetical election reported that the "Total Turnout" was 200,000, and that there were 200,000 "A Ballots Cast" and 160,000 "B Ballots Cast." Of the "B" ballots, 81,000 reflected "yes" votes, 75,000 reflected "no" votes, and 4000 were blank. If the constitu-

tional proposition were the convention question, it would pass because the 81,000 "yes" votes represent a majority of the 160,000 ballots cast upon the question. If, on the other hand, the constitutional proposition were a proposed amendment, it would fail because the 81,000 affirmative votes are less than fifty percent of the 200,000 "total vote cast at the election," even though the affirmative votes constitute a majority of the 156,000 "votes tallied upon the question." Therefore, the argument that "[r]ejecting the position of Defendants would require this Court to find that the delegates had *sub silentio* made it harder to hold a convention than to ratify an amendment" is demonstrably incorrect.

## IV. *CONCLUSION*

Based on the foregoing, we hold that "ballots cast," within the meaning of article XVII, section 2 of the Hawai'i Constitution, includes blank ballots and over votes. This interpretation, unlike that offered by Defendants and their amici, (1) gives effect to the plain language of article XVII, section 2, (2) reflects the intent of the drafters and those voting to ratify the constitution as demonstrated by the committee reports and contemporaneous legislation, (3) is consistent with the circumstances existing when the provision was drafted and adopted, (4) renders every phrase of section 2 operative, and (5) harmonizes the various provisions of the same section.

Accordingly, because 163,869 people voted affirmatively on the question "shall there be a convention to propose a revision of or amendment to the constitution" at the November 5, 1996 general election, and, because 163,869 is less than a majority of the 369,357 ballots cast on the question, the proposition failed. Consequently, we direct that judgment be entered in favor of the plaintiffs and order Defendant Yoshina to issue a certificate of results, pursuant to HRS §§ 11–155 and 156, indicating that the convention question was rejected.