Mark J. BENNETT, et al., Plaintiffs,

v.

Dwayne D. YOSHINA,
et al., Defendants.

No. Civ. 97–00322 SOM/BMK.

United States District Court,
D. Hawaii.

May 15, 2000.

---

Steven S. Michaels, Debevoise & Plimpton, New York City, for plaintiff.

Dorothy D Sellers, Deputy Attorney General, Office of Attorney General, Honolulu, HI, for defendant.

### ORDER DENYING PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES

MOLLWAY, District Judge.

This case involves the constitutionality of a 1996 Hawaii vote to determine whether a constitutional convention should be held to propose amendments to the Hawaii state constitution. Plaintiffs Mark J. Bennett, Charles S. Frumin, Bobbie Carinio, Mark K. Spengler, Jerry Beck, Let the People Decide, and Citizens for a Constitutional Convention ("Plaintiffs") sued Defendants Dwayne D. Yoshina, Chief Elections Officer of the State of Hawaii, Benjamin J. Cayetano, Governor of the State of Hawaii, Mazie K. Hirono, Lieutenant Governor of the State of Hawaii, and the Office of Elections ("Defendants"), seeking an order requiring Defendants either (a) to certify that the holding of a constitutional convention had been approved in a 1996 election or (b) to hold a new election on whether there should be a constitutional convention. After losing on appeal, Plaintiffs moved for attorneys' fees on the theory that this lawsuit was a catalyst for the Hawaii legislature's decision to place the constitutional convention issue before the voters again in 1998. Because Plaintiffs have not met their burden of showing a causal relationship between this lawsuit and the Hawaii state legislature's placement of the constitutional convention issue on the ballot in 1998, the court denies Plaintiffs' motion for attorneys' fees.

## I. BACKGROUND

### A. The 1996 General Election

Amendments to the Hawaii constitution may be proposed either by the legislature or by a convention. "The legislature may submit to the electorate at any special or general election the question, 'Shall there be a convention to propose a revision of or amendments to the constitution?'" Haw. Const. art. XVII, § 2. The question of whether to hold a constitutional convention, in any event, must be submitted to the electorate within ten years of last submission. Id. The constitutional convention question was posed in 1966, 1976, and 1986, and was again submitted to the electorate at the November 5, 1996 general election.

A constitutional convention involves review of the entire constitution. It was anticipated that, if a constitutional convention were held, it would be dominated by debate over proposed constitutional amendments relating to a few hotly debated issues, particularly same-sex marriage and Native Hawaiian sovereignty. The ensuing controversy over whether a constitutional convention should be held is reflected in the closeness of the vote on the issue. In the November 5, 1996 election, 163,869 votes were in favor of a constitutional convention, 160,153 votes were against, 45,245 ballots were left blank on the issue, and 90 were marked both "yes" and "no" ("over-votes").

Under the Hawaii state constitution, a constitutional convention will be held only if "a majority of the ballots cast upon [the convention] question be in the affirmative [.]" Haw. Const. art. XVII, § 2. This language had never been interpreted before the 1996 election. The gap between votes in favor and votes against was large enough that, in the 1966, 1976, and 1986 elections, the result was not affected by the way blank votes and over-votes were treated. The 1996 vote, however, was sufficiently close that the outcome of the vote was dependent on the interpretation of the phrase "a majority of the ballots cast." If only "yes" and "no" ballots were considered in determining whether a majority of the votes were in the affirmative, then the constitutional question had passed because there were more "yes" votes than "no" votes. If blank votes and over-votes were considered as "ballots cast," the question had failed because the number of "yes"

votes was less than the combined total of "no" votes, blank votes, and over-votes.

On November 6, 1996, the day after the election, the Chief Elections Officer, Dwayne Yoshina, requested an advisory opinion from the Attorney General of the State of Hawaii on how to determine "a majority." In an opinion rendered on November 19, 1996, the Attorney General concluded that blank ballots and over-votes were not "ballots cast," and, as a result, the constitutional question had been approved. *See* Op. Att'y Gen. No. 96–5 at 13.

### B. *The Hawaii Supreme Court's Decision*

Shortly thereafter, on November 25, 1996, the Hawaii State AFL—CIO, along with fifty-one individually named plaintiffs, sued the State of Hawaii and various state officials, including the Chief Elections Officer, the Governor, the Lieutenant Governor, and the Attorney General, in an original proceeding brought in the Hawaii Supreme Court pursuant to Haw. Rev.Stat. § 11–172. The plaintiffs sought a declaratory judgment stating that the November 5, 1996 general election ballot measure on whether to convene a constitutional convention had not received the affirmative mandate required by the Hawaii Constitution.

As the "final unreviewable authority to interpret and enforce the Hawaii Constitution," *State v. Fields,* 67 Haw. 268, 686 P.2d 1379, 1390 (1984), the Hawaii Supreme Court held that the phrase "a majority of the ballots cast" referred to all submitted ballots that contained the question, even blank ballots and over-votes. Because a majority of the ballots cast on the question were not affirmative votes, the Hawaii Supreme Court, in a decision issued on March 24, 1997, ordered the Chief Elections Officer to certify that the constitutional convention question had been rejected. *Hawaii State AFL—CIO v. Yoshina,* 84 Hawai'i 374, 935 P.2d 89, 98 (1997). That decision was met with both elation and disappointment.

### C. *United States District Court Proceedings*

Three weeks after the decision in *Yoshina,* on April 15, 1997, Plaintiffs commenced this federal court action. They claimed that *Yoshina* was such an unforeseeable departure from past election practices that it denied substantive due process under the Fourteenth Amendment. Plaintiffs also alleged that counting blank ballots as votes against a constitutional convention effectively rewrote those ballots as "no" ballots and thereby coerced speech in violation of the First Amendment.

Plaintiffs asked the district court either to order that the 1996 constitutional convention question be certified as having been approved or to order an immediate new election on the question.

On July 10, 1997, on cross-motions for summary judgment, Judge David Ezra ruled in favor of Plaintiffs. He found that the constitutional convention vote had been fundamentally unfair because the decision in *Yoshina* was an unforeseeable departure from prior election practices and contradicted information the state had disseminated before the election about the effect of blank ballots. Judge Ezra voided the results of the 1996 constitutional convention measure and ordered a special election on the constitutional convention question to be held within sixty days.

### D. *Appeal to the Ninth Circuit.*

On July 15, 1997, Defendants appealed the district court's decision to the Ninth Circuit. Three days later, on July 18, Defendants filed a motion for stay pending appeal. Judge Ezra modified his order to allow the special election to be held no later than December 6, 1997. The Ninth Circuit, in an order filed on September 10, 1997, stayed the special election and expedited briefing and argument on the merits.

On March 27, 1998, the Ninth Circuit reversed Judge Exra's decision. *Bennett v. Yoshina,* 140 F.3d 1218, 1227 (9th Cir.

1998), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). The court rejected Plaintiffs' claim that the decision in *Yoshina* amounted to a denial of due process. According to the court, "the Hawaii Supreme Court's decision in *Yoshina I* was merely a clarification of the state's election laws: Hawaii used to interpret voter indifference as a reason neither for nor against amending the state constitution, but now interprets voter indifference as a reason not to convene a constitutional convention." *Id.* The court reasoned:

> [O]ne requires a vivid imagination to see how voters could have "relied" on an understanding that blank ballots would not be counted. Citizens who wished to vote "yes" or "no" were presented with a clear way to do so. Voters who didn't care simply left the question blank. It is beyond belief to suggest that thousands of voters who left the convention question blank were secretly relying on the hope that their votes would not be counted, and that they would have voted "yes" had they foreseen the decision in *Yoshina I.* They did not vote because they did not care enough to do so.

*Id.*

The court similarly rejected Plaintiffs' First Amendment challenge. According to the court, "[i]t is perfectly constitutional for a state to demand that a proposition win not only a majority of the votes cast, but a majority of all the votes that could have been cast." *Id.* Because "Hawaii was not forcing anybody to vote," but merely "deciding not to hold a constitutional convention if the majority of the voters either don't want one or don't care," there was no First Amendment violation. *Id.* at 1227–28.

The Ninth Circuit remanded the case with instructions to enter summary judgment in Defendants' favor, vacated the district court's injunction ordering a new election on the constitutional convention question, and vacated the stay of injunction pending appeal.

On April 10, 1998, Plaintiffs filed a petition for rehearing and a petition for rehearing en banc. On June 23, 1998, the Ninth Circuit nonsubstantively amended its March 1998 opinion and rejected Plaintiffs' requests for rehearing and rehearing en banc. Thereafter, Plaintiffs filed a petition for certiorari to the United States Supreme Court. That certiorari petition was denied on January 19, 1999.

### E. *1998 Legislative Proceedings*

Hawaii's legislature is in session only part of each year. In 1997, the legislative session began on January 15, 1997, and ended on May 1, 1997. On January 21, 1998, the Hawaii legislature began its 1998 legislative session. On January 28, 1998, a bill was introduced in the Hawaii House of Representatives, H.B.3130, providing for submission of the constitutional convention question to the electorate at the November 1998 general election. H.B.3130 was signed into law by the Governor as Act 131 on May 1, 1998.

As a result of Act 131, the constitutional convention question was submitted to the electorate by legislative option at the November 3, 1998 general election. The question was rejected. There were 140,688 votes in favor, 244,753 against, 26,784 blank, and 295 spoiled ballots.

### F. *Fee Litigation*

In July 1998, Plaintiffs filed in the Ninth Circuit a motion titled, "Suggestion of partial mootness and plaintiffs' motions: (1) to transfer plaintiffs' claim for attorneys' fees to the district court, or, in the alternative, for award of attorneys' fees on appeal, (2) to recall the mandate, and (3) to vacate the judgment and remand with instructions." The fee motion was based on the theory that Plaintiffs' lawsuit had been a catalyst for the Hawaii legislature's passage of H.B.3130, which submitted the constitutional convention question to the Hawaii electorate in 1998.

On January 12, 1999, the Ninth Circuit remanded the fee issue to the district court, stating:

> The district court shall make a determination of the "causal link" factor, on the basis of an evidentiary hearing or otherwise as it deems appropriate. If it finds in Bennett's favor on this factor, it shall then award plaintiffs an appropriate amount of attorneys' fees on appeal, after taking into account the usual factors, including their degree of success on appeal.

On January 29, 1999, Judge Ezra, by then Chief Judge, recused himself, and the case was reassigned to the present judge.

On February 2, 1999, this court referred Plaintiffs' motion for attorneys' fees to the Magistrate Judge to adjudicate "as a special master." On September 10, 1999, the Magistrate Judge granted Plaintiffs' request for discovery on the fees motion. Defendants responded to Plaintiffs' requests for admissions, answers to interrogatories, and production of documents. The parties then briefed the attorneys' fees issue, and the Magistrate Judge filed his Report of Special Master Re Plaintiffs' Motion For An Award of Attorneys' Fees on February 25, 2000. Based on papers submitted by the parties, the Magistrate Judge recommended that Plaintiffs' motion for fees be granted.

On March 20, 2000, Defendants filed objections to the Magistrate Judge's Report. This court declines to adopt the recommendation in the Report that, because this lawsuit was allegedly a catalyst for passage of legislation in 1998, fees should be awarded to Plaintiffs.[1]

## II. STANDARD OF REVIEW

The parties dispute the standard under which this court should review the Magistrate Judge's Report. As this motion for attorneys' fees was referred to the Magistrate Judge, who was directed to prepare a Report as a special master pursuant to Local Rule 53.1,[2] Plaintiffs argue that Rule 53 of the Federal Rules of Civil Procedure controls.[3] Rule 53 states:

> In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties.... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

Fed.R.Civ.P. 53(e)(2). Thus, under Rule 53(e)(2), a special master's factual findings are reviewed for clear error.[4]

Plaintiffs also argue that clear error applies because the issue to be decided by this court, i.e., whether there is a causal

---

1. This court does, however, adopt the recommendation in the Report denying Plaintiffs' request that fees be awarded as a discovery sanction. Neither party challenged this portion of the Report.

2. Under Local Rule 53.1, the Magistrate Judge designated to handle nondispositive matters in a civil case is, "in accordance with 28 U.S.C. [§] 636(b)(2) and Fed.R.Civ.P. 53, 54(d)(1)(A), and 54(d)(2)(D), designated to serve as special master to adjudicate any motion for attorneys' fees and related nontaxable expenses" in that case "unless otherwise ordered by a district judge."

3. Defendants argue that, rather than Local Rule 53.1, Local Rule 74.2 controls. Local

Rule 74.2 provides for de novo review of a Magistrate Judge's findings. Because Local Rule 53.1 specifically deals with designations of fees motions, in contrast to Local Rule 74.2, which generally deals with review of case-dispositive proposed orders, findings, or recommendations, the court looks to Local Rule 53.1.

4. A finding is clearly erroneous only when "on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *See also Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

connection between this lawsuit and the legislature's decision to place the constitutional convention question on the ballot in 1998, is a factual one. *See, e.g., Sablan v. Department of Finance,* 856 F.2d 1317, 1325 (9th Cir.1988) ("The 'causal link' prong of th[e] two-part 'catalyst' test for determining 'prevailing party' status is nothing more than an inquiry into factual causation"). In designating the causation issue to this court to adjudicate, the Ninth Circuit also referred to the inquiry as a "factual" one. *See* Order filed January 12, 1999 ("This inquiry is 'an inquiry into factual causation' ").

Clear error review, however, is not applicable here because the Magistrate Judge did not make factual findings. The Ninth Circuit transferred the causation issue to this court to determine by "evidentiary hearing or otherwise" the factual basis for Plaintiffs' claim that their lawsuit was a catalyst for legislative action. While an evidentiary hearing was one possible way to determine causation, the Ninth Circuit left it to this court to determine the best way to decide causation based on the facts and circumstances presented by this case. The parties here agreed to the relevant facts in this case, making it unnecessary for the Magistrate Judge to engage in independent fact-finding and/or to judge the relevant credibility of witnesses. Rather than dispute the facts, the parties here dispute the legal effect of those undisputed facts.

The evidence the Magistrate Judge had before him is the exact same evidence this court has before it. The Magistrate Judge was in no better position than this court now is to determine whether this lawsuit was indeed a catalyst for legislative action. Because he made no factual findings, his Report is analogous to a ruling based on stipulated facts. When, as is the case with stipulated facts, the facts are undisputed, review of the result is de novo. *See Whitmire v. C.I.R.,* 178 F.3d 1050, 1051 (9th Cir.1999) (reviewing de novo the tax court's application of law to undisputed

facts); *Estate of McClatchy v. C.I.R.,* 147 F.3d 1089, 1090 (9th Cir.1998) (reviewing de novo a case submitted only on stipulated facts); *Durando v. U.S.,* 70 F.3d 548, 549 (9th Cir.1995) (finding that "[t]he issue for review, which was submitted to the district court on cross-motions for summary judgment based on stipulated facts, is a legal one subject to de novo review").

■ Even if the Magistrate Judge had made factual findings, the clear error standard would apply only to the portion of his Report constituting findings of fact. His legal conclusions would be reviewed de novo, as would mixed questions of law and fact. *See Stivers v. Pierce,* 71 F.3d 732, 751 (9th Cir.1995) ("we will reverse the fee determination if the district court applied an incorrect legal standard in arriving at its decision"); *see also Falkowski v. Demske,* No. CIV–80–983E, 1985 WL 5574 (W.D.N.Y. Nov.23, 1985) (finding that conclusions of law and conclusions of mixed fact and law "are subject to close review and, particularly when weighing the special master's legal conclusions and recommendations concerning costs and attorney's fees, the report and recommendation should be considered de novo").

■ This court is well aware that, even under the clear error standard, a district court should never act as a "mere rubber stamp" for the findings and conclusions of a special master. *See Burlington Northern R.R. v. Department of Revenue,* 934 F.2d 1064, 1072 (9th Cir.1991) ("the district court's 'rubber stamp' of the master's order is an inexcusable abdication of judicial responsibility and a violation of article III of the Constitution"); *accord Stauble v. Warrob, Inc.,* 977 F.2d 690, 696 (1st Cir. 1992) (disapproving "the mere 'laying on of hands' by a district judge who adopts a magistrate's or master's recommendation of liability pro forma"); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.,* 737 F.2d 698, 712 (7th Cir.) (disapproving practice of adopting special master's report "without independent analysis"), *cert. denied,*

469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

As it turns out, with respect to the matters on which this court disagrees with the Magistrate Judge, this court's ruling remains the same under either the de novo or the clear error standard.[5]

### III. DISCUSSION

 In civil rights actions, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. *See also Stivers,* 71 F.3d at 751 ("A plaintiff may only recover fees under section 1988 if he is the 'prevailing party'"). "A plaintiff will be a 'prevailing party' if [it] 'succeed[s] on any significant issue in litigation which achieves some of the benefit which the part[y] sought in bringing the suit.'" *Kasza v. Browner,* 133 F.3d 1159, 1175 (9th Cir.) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)), *cert. denied,* 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). "A party, however, need not obtain any formal judicial relief to be a prevailing party; rather all that is necessary under the 'catalyst test' is that '(1) as a factual matter, the relief sought by the lawsuit was in fact obtained as a result of having brought the action, and (2) there was a legal basis for the plaintiffs' claim.'" *Id.* (quoting *Idaho Conservation League, Inc. v. Russell,* 946 F.2d 717, 719 (9th Cir.1991)). Put another way, Plaintiffs have the burden of showing that: (1) there is a "clear causal relationship" between the lawsuit and the relief actually obtained; and (2) there is a legal basis for the claim, that is, the claim must not be "frivolous, unreasonable or ground-

less." *See Rock Creek Ltd. Partnership v. State Water Resources Control Bd.,* 972 F.2d 274, 277 (9th Cir.1992), *cert. denied,* 508 U.S. 949, 113 S.Ct. 2439, 124 L.Ed.2d 657 (1993); *Sablan,* 856 F.2d at 1325.[6]

 The Ninth Circuit has already determined that there was a "legal basis" for Plaintiffs' claims. The court remanded the case to this court for a determination of whether there was a clear causal relationship between this lawsuit and the passage of H.B.3130.

With respect to causation, this court must first determine what Plaintiffs sought to accomplish in bringing the lawsuit and then determine whether the lawsuit was causally linked to the relief actually obtained. *Sablan,* 856 F.2d at 1325; *Beach v. Smith,* 743 F.2d 1303, 1306 (9th Cir. 1984). In their Complaint, Plaintiffs request either an order that the 1996 constitutional convention question be certified as having been approved or an order requiring an immediate new election on the question. Defendants argue that the relief allegedly obtained, passage of H.B.3130, was not "the relief originally sought through litigation," as the legislation provided for the question to be placed before voters in 1998, while the lawsuit, filed in April 1997, sought an immediate new election.

The Ninth Circuit, however, does not require that the relief requested be exactly what was achieved. "'[A]s long as the relief obtained is of the same general type' as that demanded by [plaintiffs], [the court is to] assess whether there was a 'causal connection between the relief obtained and the lawsuit.'" *Sablan,* 856 F.2d at 1325 (finding that fees were not precluded by

---

5. Plaintiffs argue that any disagreement by this court should be remedied by referral of this case back to the special master. Because the fees issue was originally entrusted to this court, and because Fed.R.Civ.P. 53(e)(2) authorizes this court to adopt, reject, or modify the Report, as well as entertain additional evidence, the court finds no impediment to its adjudicating the fee issue on the basis of the record before it.

6. At the hearing on this matter, Plaintiffs argued that *Sablan* sets forth a "presumption" in favor of awarding fees based on the reluctance by most defendants to admit that the lawsuit was a factor in the result. The court has thoroughly reviewed that decision and finds no such presumption in favor of awarding fees. Thus, the court relies on the catalyst test set forth in *Sablan* and its progeny.

the fact that plaintiff did not obtain the permanent injunction requested in his prayer for relief where the government cessation of its policy of terminating electrical services without notice and a hearing was "essentially the same as the injunctive relief sought in the complaint"). *See also Stivers,* 71 F.3d at 753 ("While the plaintiffs did not obtain all the relief sought, they did obtain 'tangible results' ").

Finding that the enactment of Act 131 is sufficiently similar to the relief requested by Plaintiffs in the Complaint, the court proceeds to determine whether there was a "causal connection between the relief obtained and the lawsuit." *Sablan,* 856 F.2d at 1325. The inquiry is not whether the suit was the "sole cause," but whether the suit was "at least 'a material factor' " or played a "catalytic role" in bringing about the desired result. *See Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 497 (9th Cir.1987) (citation omitted). " 'At a minimum the lawsuit must have been a catalyst that prompted the opposing party to take action.' " *Id.* (quoting *McQuiston v. Marsh,* 707 F.2d 1082, 1085 (9th Cir.1983)).

While this court analyzes each category of evidence offered by Plaintiffs in support of their catalyst theory, the court is well aware that, in the end, it is the totality of the evidence that must inform its decision.

### A. *Chronology of Events*

" 'Clues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events.' " *Sablan,* 856 F.2d at 1326 (quoting *Posada v. Lamb County,* 716 F.2d 1066, 1072 (5th Cir.1983)). While chronology is "not a definitive factor ... in determining whether or not a defendant can be reasonably inferred to have guided his actions in response to a plaintiff's lawsuit," it clearly is an important factor. *Braafladt v. Board of Governors,* 778 F.2d 1442, 1444 (9th Cir.1985). *See also Sablan,* 856 F.2d at 1326 ("The chronology of events that transpired, while not dispositive of the issue of factual causation, was certainly a proper

variable for the district court to weigh in its calculus"). Chronology evidence is most convincing when supported by other material evidence. *See generally Beach,* 743 F.2d at 1306–07 (9th Cir.1984) (district court did not clearly err in finding that the plaintiff failed to prove a causal connection where plaintiff provided no direct evidence of causation, and relied solely on the sequence of events); *American Constitutional Party v. Munro,* 650 F.2d 184, 187–88 (9th Cir.1981) (holding that "chronology of events" evidence supplemented by a legislator's affidavit stating that the plaintiff's lawsuit had been discussed prior to passage of an amendment was insufficient evidence of a causal link).

The chronology in this case, which is not in dispute, strongly suggests that Plaintiffs' lawsuit was not a catalyst for legislative action in 1998. The chronology of events instead suggests that the 1996 convention question itself engendered controversy and confusion that eventually led to the legislature's decision to place the constitutional question before voters again in 1998. The lack of a causal link between this lawsuit and the legislation is demonstrated clearly by the legislature's passage of H.B.3130 even after the Ninth Circuit's reversal of Judge Ezra's decision established that the legislation was not legally required.

When the electorate voted in November 1996 on the constitutional convention question, the vote was so close that the outcome was dependent upon the manner in which blank ballots and over-votes were counted. On the advice of the state's Attorney General, the constitutional convention question was first certified as having been approved. Following the Hawaii Supreme Court's decision in *Yoshina,* the question was recertified as having been rejected by the voters. This series of events demonstrated a controversy that was bound to interest the entire electorate, regardless of whether litigation ensued. Plaintiffs do not show that their filing of this lawsuit three weeks after the Hawaii

Supreme Court's decision was a material factor in creating the general environment in which the legislature acted.

Once the Ninth Circuit held that the 1996 vote had not violated anyone's constitutional rights, the legislature had no reason to consider this lawsuit at all in deciding whether to hold a new election.[7] Any pressure caused by the possibility that the 1996 vote was unconstitutional evaporated. The legislature's passage of H.B.3130 in the face of knowledge that the 1996 vote was constitutional suggests that the legislature voted in favor of Act 131 for other reasons. Even if this lawsuit was a material factor in the *introduction* of H.B. 3130—a fact neither the Magistrate Judge nor this court finds—the chronology indicates that the lawsuit was not material to *passage* of H.B.3130.

The legislature was faced with controversy and general public confusion about the constitutional convention vote and the same-sex marriage issue, which at the time was a hotly contested subject. The chronology of events suggests that factors such as those, rather than this litigation, influenced legislators in passing H.B.3130. *See Sablan,* 856 F.2d at 1326 ("We are loath to second-guess the probative value that the district court assigned to the sequence of events prior and subsequent to the commencement of this lawsuit"); *Munro,* 650 F.2d at 188 ("This ['significant catalyst' inquiry], at best, is an uncertain, elusive, and imponderable concept; the very kind of issue which cries for reliance on informed discretion") (Thompson, J., concurring).

The Magistrate Judge noted that past votes on whether to hold a constitutional convention had occurred at ten-year intervals, while the 1998 vote occurred only two years after the convention question had been rejected in 1996. The Magistrate Judge stated, "[W]here a plaintiff's lawsuit serves to speed up improvements which were already being planned, the Ninth Circuit has held that the plaintiff could be a prevailing party on a catalyst theory." The Magistrate Judge did not, however, make an actual finding that the present lawsuit had indeed sped up the holding of a new election on the constitutional convention question. In the absence of such a finding, this court need not review the Magistrate Judge's analysis of the chronology for only clear error. Even if such a factual finding could be said to be implicit in the Magistrate Judge's Report, that finding would be clearly erroneous because it is unsupported by evidence and flies in the face of a logical reading of the chronology.

### B. *Legislative History*

#### 1. *Official Committee Reports*

Plaintiffs argue that the official committee reports demonstrate that H.B.3130 was passed at least in part because of this federal lawsuit. There are two committee reports, one from the Senate and one from the House Judiciary committee. The Senate report does not mention Plaintiffs' lawsuit. The House report makes it clear that H.B.3130 was intended to remedy the general confusion surrounding the 1996 election.

The Senate report, dated April 9, 1998, was issued after the Ninth Circuit had

---

**7.** As the Magistrate Judge's Report notes, the legislature passed H.B.3130 before the Ninth Circuit denied Plaintiffs' reconsideration motion or the United States Supreme Court denied certiorari. While it might theoretically be argued that the legislature passed H.B. 3130 out of concern either that the Ninth Circuit would reconsider its ruling and reinstate Judge Ezra's decision or that certiorari would be granted, the record would not support such an argument. There is absolutely no evidence that the legislature was influenced by the statistically very small chance that Judge Ezra's decision would be reinstated. Indeed, such an argument would be illogical. Plaintiffs argue that this lawsuit was a catalyst for legislation because the legislature allegedly thought Judge Ezra would be affirmed. To then argue that the legislature was motivated by concern that the Ninth Circuit would be reversed makes no sense.

upheld the consideration of blank votes in the 1996 election. It states:

> The purpose of this bill is to place on the 1998 election ballot the question of whether there shall be a convention to propose a revision or amendments to the Constitution.

> Your Committee finds that there has been an immense amount of controversy surrounding the results of the vote on the constitutional convention question that was placed on the 1996 general election ballot. Your committee further finds that the controversy was focussed on whether blank and spoiled ballots should be counted in determining a majority on the convention question.

> Therefore, because of this controversy and the ensuing debate regarding placing the question before the voters at the next general election, your Committee is choosing to exercise the power granted in Article XVII, section 2 of our state constitution, which allows the legislature to submit to the electorate at any general election the question regarding the convening of a constitutional convention. Your committee further finds that by exercising this power, the legislature will restore the peoples' trust in the electoral process and resolve any remaining issues regarding the peoples' right to a fair election that some citizens feel was compromised in the 1996 election.

See Exhibit 19, attached to Plaintiffs' Response to Defendants' Objections.

The House report, dated February 18, 1999, was written before the Ninth Circuit's reversal of Judge Ezra's decision and states:

> The purpose of this bill is to present to the electorate at the general election of 1998 the question of whether there shall be a convention to propose a revision of or amendments to the State Constitution.

> . . . .

Your Committee finds that there was a tremendous amount of controversy over the constitutional convention question that was placed on the ballot at the 1996 general election. There was disagreement over whether blank ballots and spoiled ballots, or ballots marked both "yes" and "no", should be counted in determining a majority on the convention question.

Lawsuits were filed in both state and federal courts on this issue. The Hawaii Supreme Court decided in March 1997, that blank ballots and spoiled ballots did count in determining the amount of ballots cast. As a result, the court held that the proposition failed.

The United States District Court for the District of Hawaii decided in July 1997, that, because the electorate was told prior to the 1996 election that blank ballots would not be counted for any purpose, the Hawaii Supreme Court's post-election decision rendered the election on the constitutional convention question fundamentally unfair. As a result, the [District] Court held that the results of the constitutional convention question were void and that the State had to hold a new special election on this issue within sixty days. That decision was appealed to the United States Court of Appeals for the Ninth Circuit.

Your committee concludes that because of the confusion over the constitutional convention question at the 1996 general election, the Legislature again should place this question on the ballot to be voted upon at the 1998 general election.

See Exhibit 15, attached to Plaintiffs' Response to Defendants' Objections.

Although the federal lawsuit is mentioned in the House report, the plain language of both reports indicates that the legislation was designed to address the "immense amount of controversy surrounding the results of the vote on the constitutional convention question." *See Goehring v. Brophy*, 94 F.3d 1294, 1304

(9th Cir.1996) (changes made by a university were in response to a Supreme Court decision, not to plaintiffs' lawsuit), *cert. denied,* 520 U.S. 1156, 117 S.Ct. 1335, 137 L.Ed.2d 495 (1997). The House report does not conclude that this lawsuit requires a new election. Instead, after mentioning this lawsuit, the House report says that the committee concludes that a new election should be held "because of the confusion over the constitutional convention question at the 1996 general election." The controversy and confusion existed well before this lawsuit was filed and Judge Ezra issued his ruling and extended well past the Ninth Circuit's decision. The lawsuit was one small part of that enormous controversy. The committee reports do not demonstrate that this lawsuit was a "material factor" in the passage of H.B. 3130.

### 2. *Contemporaneous Statements by Legislators*

Plaintiffs next argue that statements made by individual legislators on the House floor demonstrate the causal link between H.B.3130 and this lawsuit. Defendants, however, contend that, in considering legislative history, the court is limited to official committee reports.

*Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076 (9th Cir.1999), and *In re Kelly,* 841 F.2d 908 (9th Cir.1988), both limit judicial consideration of legislative history that is not contained in official committee reports. *See Hertzberg,* 191 F.3d at 1081 ("This circuit relies on official committee reports when considering legislative history, not stray comments by individuals or other materials unrelated to the statutory language or the committee reports"); *Kelly,* 841 F.2d at 912 n. 3 ("To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of leg-

islative intent.... Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill"). Those cases, however, dealt with judicial examination of legislative history as an aid to statutory interpretation, not judicial inquiry into legislative intent for catalyst purposes. The considerations applicable to statutory interpretation are clearly different from those in issue in determining whether fees are justified.

The Ninth Circuit has recognized in catalyst cases that statements by legislators made contemporaneously with legislation "might be entitled to some weight." *See Munro,* 650 F.2d at 188 (recognizing that an affidavit from a member of the conference committee that drafted the legislation "might be entitled to some weight if it had been made contemporaneously with the passage of the legislation"). *See also Gunther v. County of Wash.,* 623 F.2d 1303, 1317–18 (9th Cir.1979) ("Senator Bennett's understanding of the amendment might have been entitled to some weight if it had been expressed contemporaneously with the passage of the legislation"), *aff'd,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Accordingly, this court considers statements made by legislators contemporaneously with their consideration of H.B. 3130.[8]

However, those statements, even when considered, do not establish that the present lawsuit was a "material" factor in passage of H.B.3130. Plaintiffs point to a House floor debate concerning a rejected amendment to H.B.3130. The proposed amendment sought to include *Yoshina*'s holding in future ballot materials. The debate focused on the necessity and correctness of the amendment, and on the theory that the 1996 election was a "mess"

---

**8.** This court's consideration of these statements is in accord with the portion of the Magistrate Judge's Report that states, "The court finds the statements made by legislators and reported in daily reports or committee reports can be reliable evidence and may be included in a factual inquiry on causation." The court, however, differs with the Report's interpretation of that legislative history.

and that *Yoshina* relied on a technicality to thwart the will of the people. The parties submit no debate on the body of H.B.3130 itself.

In discussing the amendment that was ultimately rejected, Rep. Quentin Kawananakoa is reported as having said:

Mr. Speaker, the purpose of this amendment is to ensure that we don't end up in the same mess that we are in right now. It is very clear.

As you know Mr. Speaker, last election a majority of the votes cast as "yes" outnumbered the votes cast as "no" for the question on calling for a constitutional convention.

Therefore, my estimation is that the people of Hawaii believe that they have spoken and have clearly said that they wanted a constitutional convention.

The powerful special interest groups that don't want any changes to government that is benefitting them, petitioned the Hawaii Supreme Court to overrule the people's mandate by arguing that the blank votes and the spoiled votes should be cast and counted as "no" votes, Mr. Speaker. The court agreed on technical grounds and the people's will was thwarted.

This decision was appealed to the Federal Court and Judge Ezra ruled that under the Hawaii State Supreme Court's ruling and their decision, the vote was unfair—greatly unfair—because the people didn't know that the blank and spoiled votes would be considered as "no" votes.

So here we are today, passing this measure calling for a constitutional convention, which I am in complete support of, but I am concerned because we want to set the record straight so we don't end up in the same mess again.

This amendment simply calls for a clarification so that our Elections Officer will include or otherwise inform the public and ensure that they know that when they don't vote, if they give a blank vote, or they over vote, or they spoil their ballots, that these will be considered "no" votes, and with that the people would be able to clearly vote their conscience and understand the ramifications of being silent. You notice this in Hawaii: If you're not sure, you don't want to talk "stink", you just don't say anything. So a lot of people may have just remained silent, because they didn't know it was going to be counted as a "no" vote. So we are going to pass this measure and many of our constituents, many of the people of Hawaii, will still be in the dark. They still won't know in their mind that their silence will be counted as a "no" vote on whether or not to have a constitutional convention.

I think it is incumbent upon us to set a fair question before the people of Hawaii on such an important matter. I would suggest all my colleagues to do the democratic thing; vote "yes" for this amendment. Give the people a fair shot, a fair understanding, of what they are voting on.

Rep. Terrence Tom spoke in opposition to the amendment to H.B.3130. He said:

Mr. Speaker, I got several reasons that I am speaking in opposition.

I agree with the good Representative that we, too, don't want to end up in the mess that we ended up in 1996. We want to make sure that we pass a constitutional amendment bill right away so that the people will have this opportunity to vote again in 1998 on the question of whether they want a constitutional convention. Let the people decide; we agree.

I looked at the amendment and I looked at the case—the Supreme Court case. I went back to the case and I read it over and over again, over and over again, and you know what? I thought I was dreaming, because I couldn't find in there what is quoted in this amendment in its entirety. I don't know why. I said: Something must be wrong. I agree that when they quoted

the Supreme Court, it said: "Ballots cast within the meaning of Article XVII, Section 2 of the Hawaii Constitution, includes blank ballots and over votes." Yes, it did say that. Then I read on their quote, and it said: "in other words, blank ballots and over votes shall be treated as no votes on the question of whether a constitutional convention should be convened." I kept reading, and I kept reading, and all I saw after the first part was, it said: "This interpretation, unlike that offered by the[ ] defendants, gives effect to the plain language in Article XVII, Section 2." I couldn't find where it says: "In other words, blank ballots and over votes shall be treated as no votes" blah, blah, blah. And it's not there, and it's quoted from the Supreme Court.

Mr. Speaker, I apologize. I apologize because I think that it's unforgivable. It's deceptive to quote something from anybody that ain't there. That is wrong—Democratic or Republican. It's not there in the quote. Who are we trying to fool?

In addition, I think this kind of amendment, although done in good intent, sets bad precedent. You know, it's so easy to throw stones at things, but then, do we have to do this in every amendment that we pass out of here, that we have to put all kinds of instructions to the Elections Office?

. . . .

I think the solution, members, is education. Education, discussion, collaboration, education. Since the Supreme Court came out, since Ezra's decision came out in the Federal Court, there has been a lot of talk about the meaning of a yes vote, a no vote, a blank vote, by people.

Rep. Gene Ward then spoke in support of the amendment, saying:

Mr. Speaker, information is power, and we have kept our people in ignorance. A Federal judge has decided, and why we are in the state we are in is that the people did not know.

This amendment is simply giving the people a clear idea of what they will do when they either vote no or if they spoil their ballots, that will be counted against the constitutional convention. It is a very simple directive. This says to the people: You will be told by the Elections Officer what it is that you're actually doing in the booth if you vote no or if you spoil it, or if in effect you do other than vote yes for it. That is a very clear indication of where we are.

Mr. Speaker, we need this to open the eyes of the people. There is a confusion that the Federal Judge has already spoken of. I think we can do the least in educating our people by having this amendment passed.

*See* Exhibit 17, attached to Plaintiffs' Response to Defendants' Objections. Following additional colloquy by other legislators, H.B.3130 passed Third Reading without the proposed amendment.

While there are surely references in the colloquy to Judge Ezra's decision in this case, it is difficult to interpret those references as suggestions that Judge Ezra's decision or this lawsuit prompted the vote in favor of H.B.3130. Even if this court deems colloquy on a rejected amendment to reflect legislative intent in passing H.B. 3130, the court remains concerned that statements by a few individual legislators do not express the legislature's "collective mind" as to H.B.3130. *See Gunther*, 623 F.2d at 1318 ("Either from a legal standpoint or as a practical matter, Senator Bennett's statement cannot express what was on Congress' collective mind when it acted a year earlier"). *See also Foreman v. Dallas County*, 193 F.3d 314, 322 (5th Cir.1999) ("No one legislator, or even a group of three legislators, has sufficient personal knowledge to declare the overall intent of the Texas legislature").

The most the three legislators' comments show is that those legislators were aware of the present lawsuit. Mere

knowledge of a pending suit does not mean the suit caused passage of H.B.3130. *See Forest Conservation Council v. Devlin,* 994 F.2d 709, 712 (9th Cir.1993) ("[T]hat Devlin may have been aware of the lawsuit before he made his decision does not prove that the district court's interpretation of the events is clearly erroneous"); *see also Munro,* 650 F.2d at 188 ("[T]he causal relation between the lawsuit and the relief received 'must be more than simple knowledge that litigation may occur' ") (citing *Iranian Students Assoc. v. Sawyer,* 639 F.2d 1160, 1163 (5th Cir.1981)). Because Plaintiffs have not shown that the three legislators' statements demonstrate more than mere awareness by those legislators of the lawsuit, the court cannot say that those statements show that the lawsuit was a "material factor" in the passage of H.B.3130. *See Munro,* 650 F.2d at 188 (even assuming legislator's statement "represents a statement on behalf of other legislators, it still does not persuade us that appellant's suit was at least a 'material' factor in the legislative process .... [as it] states only that the suit was 'discussed,' not that it played a causal role in passage of the amendment"). *See also Foreman,* 193 F.3d at 322.

### 3. Hearsay Statements Offered After H.B.3130 Was Passed.

Plaintiffs argue that causation can further be shown through the declaration of Plaintiff Mark Bennett, who lobbied for passage of H.B.3130 during the 1998 legislative session. According to Bennett, Rep. Terrence Tom, the then chairman of the House Judiciary Committee, told Bennett that "the instant federal court Lawsuit, and Judge Ezra's order, alerted him to

significant unfairness in the 1996 Constitutional Convention election." Declaration of Mark Bennett ("Bennet Dec.") ¶ 3. Bennett further states that Sen. Matt Matsunaga and Sen. Avery Chumbley specifically told him that they would "shepherd [the bill] through passage in the Senate ... even though they were opposed to the Convention itself .... because of the lawsuit that [Bennett] had filed, which brought out very clearly the unfairness in the 1996 general election, as highlighted by Judge Ezra's opinion." *Id.* ¶ 6. According to Bennett, after the Ninth Circuit's reversal of Judge Ezra's opinion, while the petitions for rehearing and rehearing en banc were pending, both Matsunaga and Chumbley asked about the effect that H.B. 3130 would have on the lawsuit, to which Bennett purportedly responded that he thought it would moot the lawsuit. *Id.* ¶¶ 7–8.

Defendants argue that the Magistrate Judge abused his discretion in considering what they characterize as the inadmissible hearsay statements attributed to Tom, Matsunaga, and Chumbley in Bennett's declaration. The court agrees with Defendants that the statements attributed to Tom, Matsunaga, and Chumbley by Bennett are inadmissible hearsay. The statements are out-of-court statements offered by Plaintiffs to prove the truth of the matter asserted, i.e., that those legislators were influenced by Plaintiffs' lawsuit. *See* Fed.R.Evid. § 801(c).[9]

█ Plaintiffs offer the statements under Rule 801(d)(2) of the Federal Rules of Evidence, which permits admission of statements that are admissions of a party-opponent.[10] According to Plaintiffs, "[t]he

---

9. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c).

10. Rule 801(d)(2) states that a statement is not hearsay if:

The statement is offered against a party and is (A) the party's own statement, in either

an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a

named defendants are state officers, and in styling the case as an official-capacity action against them[,] plaintiffs permissibly pleaded claims against the State." Because Tom, Matsunaga, and Chumbley, as legislators, were also state officers, Plaintiffs contend that "their statements to Mr. Bennett are party admissions." *See* Plaintiffs' Response at 25. The court disagrees.

Plaintiffs have sued the Governor, the Lieutenant Governor, the Chief Elections Officer, and the Office of Elections. Because each individual has been sued in his or her official capacity, the suit can properly be seen as an action against the state itself. This does not mean, however, that every state employee therefore speaks for the state. Plaintiffs' reading of Rule 801(d)(2) to cover all state employees would mean that any state official could always be said to be speaking on behalf of the state even if the statement intentionally contravened established state policy or was unrelated to the state official's function.

Plaintiffs' argument is particularly illogical in the legislative context. Plaintiffs would have every state legislator's viewpoint be an admission against the state. If every legislator could be said to speak on behalf of the state with regard to every piece of legislation, there could be no cogent state voice. It is the collective legislature, as it votes on each piece of legislation, that decides the collective voice of the state. Legislators inevitably have contradictory opinions and viewpoints on different bills. They speak for the state through the bills they act on, and it is only through the bills that they pass that they can be said to speak for the state. When a bill passes, individual legislators who explain their votes must be seen as speaking only for themselves. If the explanations were contemporaneous with consideration of the bill, and if they are offered in admissible form, then, as this court noted in considering the floor debates, such evidence may be considered, but even then only as explaining, at best, those particular legislators' votes. It is an altogether different matter to consider a hearsay statement by an individual legislator as a party admission by the state. If such a rule were adopted, the resulting cacophony would make the state's voice unintelligible.

Plaintiffs notably cite no authority for their argument that an individual legislator speaking on a topic of legislative concern speaks for the state. The court accordingly concludes that the statements attributed to Tom, Matsunaga, and Chumbley were not party admissions.

█ ·Plaintiffs next argue that, even if the statements are not party admissions, they fall under the "state of mind" exception in Fed.R.Evid. 803(3) to the rule excluding hearsay.[11] According to Plaintiffs, these statements are admissible insofar as they show that these legislators intended to take certain actions, or were impressed by certain facts.

The court agrees that a legislator's intent to support a bill and a legislator's feeling of being "impressed" by certain testimony are admissible under Rule 803(3). This admissibility, however, does

coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

**11.** Under Rule 803(3), the then existing mental, emotional, or physical condition of a de-

clarant is not excluded by the hearsay rule. In particular, the following is not excluded: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

not extend to the reason for the intent or the impression. Tom's alleged statement, for example, that "the instant federal court lawsuit, and Judge Ezra's order, alerted him to significant unfairness in the 1996 Constitutional Convention election" does not show Tom's state of mind or intent. The alleged statements by Matsunaga and Chumbley that they would "shepherd [the bill] through passage in the Senate ... even though they were opposed to the Convention itself .... because of the lawsuit that [Bennett] had filed" go to the reasons for their state of mind and do not evidence their actual state of mind.

In *United States v. Liu*, 960 F.2d 449, 452 (5th Cir.1992), *cert. denied*, 506 U.S. 957, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992), the court held:

> [Rule 803(3) ] by its own terms excepts from the ban on hearsay such statements as might have been made by Cohen of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed.... But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm scared because Galkin threatened me."

Here, Plaintiffs offer under the guise of state of mind what are really alleged reasons for the state of mind. Bennett's assertion that both Matsunaga and Chumbley asked about the effect that H.B.3130 would have on the lawsuit, for example, goes to reasoning rather than to actual state of mind. Such evidence is inadmissible hearsay.

Plaintiffs finally argue that the statements attributed to Tom, Chumbley, and Matsunaga are admissible under the Ninth Circuit's decisions in *Munro* and *Gunther*. Those cases, however, involved statements by legislators themselves, not inadmissible hearsay such as Bennett's characterization of statements by Tom, Matsunaga, and Chumbley. Even if Plaintiffs were able to provide direct statements by Tom, Matsunaga, and Chumbley in the form of their own declarations or deposition testimony, such evidence would be barred because the statements were not contemporaneous with the legislative actions in issue. *See Munro*, 650 F.2d at 188 ("As a member of the Conference Committee which drafted the legislation, Representative Nelson's statement might be entitled to some weight if it had been made contemporaneously with the passage of the legislation. Coming one year later, it is entitled to no weight and cannot be relied on as indicative of legislative motivation or intent"); *Gunther*, 623 F.2d at 1318 (statement by an amendment's sponsor of his intent in introducing the amendment is entitled to no weight when the statement comes one year after the amendment was enacted).

■ Accordingly, the court finds that the Magistrate Judge abused his discretion in considering the hearsay statements by Tom, Chumbley, and Matsunaga contained in Bennett's declaration.[12]

### C. *Anzai Report*

Plaintiffs also argue that the causal link between the legislation and this lawsuit is shown by the report of the state's then Budget Director, Earl Anzai, to the Gover-

---

**12.** Evidentiary rulings are reviewed for abuse of discretion. *See United States v. Martinez*, 182 F.3d 1107, 1110 (9th Cir.) *cert. denied*, —— U.S. ——, 120 S.Ct. 358, 145 L.Ed.2d 280 (1999); *Mark Indus. Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir.1995) (stating that a clearly erroneous as-

sessment of the evidence is an abuse of discretion). Therefore, on the matter of the admissibility of statements by Tom, Chumbley, and Matsunaga offered through Bennett's declaration, this court finds an abuse of discretion and resulting clear error.

nor, concerning whether the Governor should sign H.B.3130. Under the comments section, that report states: "The Legislature intends to end the continuing controversy over the validity of [the] 1996 general election results on the constitutional convention question by resubmitting the question on the 1998 ballot. This is a legislative prerogative pursuant to Article XVII, Section 2 of the State Constitution." *See* Exhibit 26, attached to Plaintiffs' Response.

Like the legislative history cited by Plaintiffs, this information does not show that the lawsuit was a "material" factor in the enactment of H.B.3130. Indeed, the report does not even mention this lawsuit. The reference to the continuing controversy is not necessarily a reference to this lawsuit. Plaintiffs offer no evidence connecting that reference to this lawsuit. To the contrary, the report indicates that the legislation was in response to the general controversy surrounding the interpretation of the 1996 convention question results.

#### D. *Newspaper Reports*

Plaintiffs argue that newspaper articles and editorials also evidence causation in this case. Plaintiffs claim that publicity and dissemination of information about this case played a material role in the passage of H.B.3130.

Defendants argue that the news reports are hearsay and that the Magistrate Judge erred in considering them. The court disagrees with Defendants on this point, as those news articles are relevant to determining notice to legislators and the electorate of the lawsuit. *See, e.g., Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh,* 964 F.2d 244, 246 n. 3 (3d Cir.1992); *DeMier v. Gondles,* 676 F.2d 92, 93 (4th Cir.1982). The articles are considered not for the truth of what they report but rather for the notice they provided. This notice, however, is not equivalent to a causal link between the legislation and the lawsuit discussed in those news articles.

The very closeness of the votes in the 1996 election establishes that voters disagreed sharply as to whether a constitutional convention should be held. When the Hawaii Supreme Court ruled that the electorate had rejected the holding of a constitutional convention, there were strong reactions by many in the community. Plaintiffs were among those reacting strongly. When they filed the present lawsuit three weeks after the Hawaii Supreme Court's decision, the press continued to report on the controversy. The newspapers reported Judge Ezra's decision granting Plaintiffs' motion for summary judgment and his decision extending the deadline to hold a special election. After Judge Ezra's decisions, several editorial pieces were published commenting on both the decision itself and on the desirability of a constitutional convention.

At the start of the 1998 legislative session, the Honolulu Star–Bulletin ran an editorial advocating placement of the constitutional convention question on the November 1998 general election ballot. Editorial, *Con Con Vote,* Honolulu Star–Bulletin, Feb. 16, 1998, attached as Exhibit 16 to Plaintiffs' Concise Statement of Facts (recognizing that Judge Ezra's decision had been stayed pending appeal and urging that "[t]he best way out of this mess is to try and get a clear answer from the voters in November. Let the people, not the judges, decide").

The Ninth Circuit's reversal of Judge Ezra's decision was also reported in the newspaper. These references to this lawsuit, however, do not show that the lawsuit was a catalyst for legislation. Certainly none of the articles or editorials claimed that the constitutional convention question should have been placed on the 1998 ballot because of Judge Ezra's decision or because (before March 1998) of concern that the Ninth Circuit might affirm Judge Ezra. Instead, the news reports and editorials focused on the controversy itself. The controversy predated the lawsuit and

continued steadily until the 1998 election. This lawsuit appears to have provided the "current event" that gave the media reasons for once more discussing what was clearly an ongoing controversy. But the legislature needed no similar excuse to raise the controversy in the 1998 session, and the news reports provide no evidence of a causal link.

### E. *Plaintiffs' Legislative Lobbying Efforts*

Plaintiffs pursued two separate avenues to achieve the outcome they desired. They filed this lawsuit challenging the constitutionality of *Yoshina* and requesting recertification of the 1996 election results or a new vote on the constitutional convention question. They simultaneously lobbied for passage of H.B.3130. Certainly there are situations in which pending litigation may influence simultaneous legislative lobbying efforts. *See, e.g., Grinsted v. Houston County Sch. Dist.*, 826 F.Supp. 482 (M.D.Ga.1993) ("plaintiff's own counsel helped draft the legislation and made it clear to the bill's sponsor that [plaintiff's] lawsuit was pending"). Plaintiffs do not meet their burden of making such a showing here.

In *Bullfrog Films, Inc. v. Catto*, 815 F.Supp. 338 (C.D.Cal.1993), the court awarded plaintiffs fees on a catalyst theory. In that case, the defendants conceded that, while the plaintiffs had not won their lawsuit, legislation "did result from plaintiffs' lobbying efforts." *Id.* at 341. Defendants in the present case make no such concession, arguing only that, *if* Plaintiffs influenced legislation, it was through their lobbying efforts. More importantly, in *Bullfrog*, the court recognized that plaintiffs are routinely treated as prevailing parties entitled to fees "when legislative relief is obtained in response to a lawsuit." *Id.* Again, Plaintiffs in the present case fail to make that critical showing that H.B. 3130 was passed "in response to" this lawsuit. Plaintiffs' active pursuit of judicial and legislative avenues of relief does not mean that the legislation was passed in response to this lawsuit.

### IV. *CONCLUSION*

Looking at the totality of the circumstances, this court is unpersuaded that this lawsuit was a catalyst for passage of H.B. 3130. Not only is each piece of evidence offered by Plaintiffs insufficient to demonstrate a causal link between this lawsuit and the legislation, the combination of all the evidence falls short of showing that this lawsuit was a material factor in the passage of that legislation. Therefore, based on the discussion above, the court does not adopt the recommendation in the Report that Plaintiffs be awarded their attorneys' fees on a catalyst theory.

IT IS SO ORDERED.